[Crim. No. 1924. In Bank. June 7, 1915.]

THE PEOPLE, Respondent, v. FRANK CREEKS, Appellant.

CRIMINAL LAW—COMMITMENT BY JUSTICE OF THE PEACE—CONSTITUTIONAL LAW.—It is proper to deny a motion to set aside an information upon the ground that the defendant was not committed by a magistrate, when he was committed by a justice of the peace, since sections 1, 11, and 15 of article VI of the constitution, adopted October 10, 1911, did not have the effect of abolishing justices' courts.

ID.—EVIDENCE SHOWING PROBABLE CAUSE—HABEAS CORPUS.—A motion to set aside an information upon the ground that the evidence before the magistrate was not sufficient to show probable cause is properly denied since such objection can be raised only in proceedings in *habeas corpus.*

ID.—QUESTIONS—JURORS—NOT PREJUDICIAL TO DEFENDANT.—A question put to two jurors on their *voir dire* as to whether they would

follow a certain instruction if given by the court, the instruction itself being contrary to law, where the question or the answer to it do not show misconduct on the part of the district attorney, is not prejudicial to the defendant.

ID.—CONSPIRACY TO ESCAPE FROM STATE PRISON—VERDICT SUPPORTED BY THE EVIDENCE.—In this prosecution for murder for the killing of a guard at a state prison, where the evidence shows a planned and concerted action on the part of defendant, a life term convict and another prisoner serving a term less than life, to escape from the prison, and in the accomplishment of the escape to use such force as was found to be necessary, the facts that the defendant did not assault the deceased guard, and that no specific agreement was shown by the defendant and his associates to kill anybody in their concerted plan to escape, do not require a reversal of a verdict of guilty of murder in the first degree as unsupported by the evidence, since the killing of any person standing between them and the accomplishment of their purpose to escape is the material consequence of the execution of their common design, notwithstanding that it is not made a crime by law for one undergoing a life sentence to escape or attempt to escape from a state prison.

ID.—ESCAPE FROM STATE PRISON—AIDING AND ABETTING SAME.—By the law of this state it is a felony for any one confined in a state prison for a term less than life to attempt to escape or to escape therefrom, and any one including one serving a life sentence in such prison aiding and abetting such person in the commission of such felony is a principal therein.

ID.—CONSPIRACY—RESPONSIBILITY FOR ACTS OF CO-CONSPIRATOR—COMMON DESIGN.—If several persons conspire to commit an unlawful act, each person is criminally responsible for the acts of his associates committed in furtherance of their common design, although the act committed was not intended as a part of such design if it is nevertheless the reasonable consequence of such design; but a conspirator is not responsible for an act of a co-conspirator which is not a part of their common design, was not originally contemplated, is not in furtherance of it and not the legitimate consequence of anything connected therewith.

ID.—INSTRUCTION TO JURY—FELONY.—An instruction that a prisoner in the state prison for a term of less than life, who attempts to escape is guilty of a felony, that any conspiracy for the purpose of accomplishing the escape of such person is a conspiracy for the accomplishment of an unlawful act, and that all persons concerned in the commission of a crime are guilty as principals whether they commit the act directly or merely aid and abet it, and that one who aids and abets a convict confined in a state prison for a term less than life to escape therefrom is guilty of a felony, states the law correctly.

ID.—INSTRUCTION HELD NOT PREJUDICIAL TO DEFENDANT.—An instruction stating it to be the duty of a convict informed of an expected attempt to escape by a convict confined in a state prison for a term less than life, and not desiring to participate therein, to report the same, and stating further that if he aids and abets in such escape he is responsible for all the consequences that follow the conspiracy, is incorrect in stating the moral duty as to giving the information, but in view of the context is not prejudicial to defendant, since the portion of it relating to aiding and abetting the escape states the law correctly.

ID.—REQUESTED INSTRUCTION—LIFE-TERM PRISONER ASSISTING CONVICT FOR TERM LESS THAN LIFE.—A requested instruction involving the proposition that it is not a crime for one serving a life term in a state prison to aid one confined therein for a term less than life to escape therefrom was properly refused.

ID.—SPECIFIC AGREEMENT.—A requested instruction declaring substantially that the defendant could not be convicted of murder unless he actually struck the deceased, or unless it was specifically agreed between the conspirators as a part of the conspiracy that they would "kill and murder any one who interfered" with their escape, was properly refused.

ID.—DEFENDANT AS WITNESS—SCOPE OF CROSS-EXAMINATION.—Although a defendant in a criminal action cannot be compelled to be a witness against himself, if he testifies he may be cross-examined as to such testimony as fully as any other witness, and may be questioned as to any fact which if brought out would be inconsistent with his direct testimony.

ID.—IMPROPER CROSS-EXAMINATION—NOT PREJUDICIAL TO DEFENDANT.— A question directed to defendant over his objection, as to whether he knew that his co-conspirator was serving a term in a state prison of less than life, although probably not proper cross-examination, was not of sufficient consequence to justify a reversal, since such knowledge on the part of defendant was not essential to his guilt as principal in the charge for which he is being tried.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order refusing a new trial. Herbert E. White, Judge.

The facts are stated in the opinion of the court.

J. S. Clack, and J. T. Fuller, for Appellant.

U. S. Webb, Attorney-General and J. Charles Jones, Deputy Attorney-General, for Respondent.

ANGELLOTTI, C. J.—The defendant was convicted of murder in the first degree upon an information charging him with the murder of one J. P. Drewry, in October, 1914, in Sacramento County. This is an appeal from the judgment of death given upon such conviction, and from an order denying defendant's motion for a new trial.

1. Before entering his plea of not guilty, defendant made a motion that the information be set aside on the ground "that before the filing thereof the defendant had not been legally committed by a magistrate." (Pen. Code, sec. 995.) This motion was denied. It was claimed that he had never been committed for trial by a "magistrate." The commitment was by a justice of the peace of Granite Township in Sacramento County. Justices of the peace are magistrates. (Pen. Code, sec. 808.) The claim is that justices' courts were abolished by the amendments of sections 1, 11 and 15 of article VI of the constitution adopted October 10, 1911. The same claim was made *In the Matter of Woods,* 161 Cal. 238, [118 Pac. 792], and we held that the amendments had no such effect. We adhere to the views there expressed. It was further claimed that the evidence adduced on the preliminary examination before the magistrate did not sufficiently show probable cause to warrant a commitment for trial. Such an objection is not available on motion to set aside an information. By reason of an express statutory provision so declaring (Pen. Code, sec. 1487, subd. 7), such an objection may be raised on *habeas corpus,* if timely made, and we know of no other way in which it can be raised. It is not included in the grounds specified in the statute for the setting aside of an information. The subdivision relied on, that providing for such a motion on the ground that the defendant has not been "legally committed by a magistrate," has no reference to the matter of the sufficiency of the evidence upon which a magistrate has acted. (See *People* v. *Beach,* 122 Cal. 37, [54 Pac. 369].) The trial court did not err in denying the motion to set aside the information.

2. Complaint is made that the trial court erred in overruling objections to a certain question put to two jurors on their *voir dire* by the district attorney. Substantially the question was if the court instructed the jury in a certain way as to the law, would the jurors follow the instruction. It is claimed that the law would not sanction any such instruction.

There is nothing in the nature of the question or in the record to indicate any misconduct on the part of the district attorney in asking the questions, and we are utterly at a loss to perceive how the defendant's cause could have been prejudicially affected by either the questions or the answers thereto.

3. It is claimed that the evidence was insufficient to warrant a conviction of defendant on the charge against him, viz.: the murder of J. P. Drewry. To a proper understanding of the claim of defendant in this regard, and also of certain other claims relative to the instructions given or refused, a brief statement of some of the facts is essential.

The homicide was committed a few · minutes after 8 o'clock on the evening of October 16, 1914, in the California State Prison at Folsom. The deceased Drewry was an officer of the prison, being sergeant of the first night watch. Defendant was serving a life term therein, adjudged upon conviction of the crime of murder. He was and for about two years next preceding had been occupying a cell with a convict named Phelps, who was serving a term less than life. By 8 o'clock on the evening referred to, all of the prisoners, including defendant and Phelps, had been locked in their respective cells. Through the wicket in the door of their cell, defendant and Phelps had a view of the inside gate. About that hour a guard looked into their cell and saw them both therein. Very shortly after 8 o'clock Captain Drewry, in accordance with his custom, came to the outside from within to obtain certain firearms to distribute among the inside guards, such weapons being allowed to such guards only after the prisoners had been locked in their cells. He obtained the weapons, four revolvers, and with one Kerr, a guard who had charge of the outer gate, walked along the passageway from the outer to the inside gate, which was open and which Kerr was to close and lock after Drewry had passed through. They were talking as they walked along to the inside gate, and paused a moment as they reached it, apparently to finish the conversation. Here they were attacked by defendant and Phelps, who in the meantime had obtained egress from their cell and reached the gate. It was subsequently ascertained that their cell door had been unlocked from the inside by means of a key fitted in the end of a piece of wire, prepared for that purpose by

one or both of them. Phelps had a knife in his possession when they left their cell. Defendant had a dumb bell and probably also a knife. Defendant attacked Kerr, striking him on the head with the dumb bell and knocking him down or partly down to the floor of the passageway, while Phelps engaged in a struggle with Drewry. Defendant, after so striking Kerr, attempted to pull him inside the inner gate, but Kerr managed to break away and finally reached the outside gate, which he was unable to lock, not being able to find the key. He shut this gate, defendant reaching it about this time, and threatening to shoot him with one of the revolvers dropped by deceased when attacked. Kerr ran and gave the alarm and returned. In the mean time, defendant and Phelps had come through the outside gate into the yard, both armed with revolvers. Shooting ensued between the two convicts and the guards in the yard, with the result that Phelps was shot and killed, and a guard named Maher was shot in the hip and died within a few days. Defendant ran down toward the river and escaped, but was recaptured the next night at a place named Loomis, a few miles from the prison. Drewry was found a few minutes after the struggle at the inside gate, on the inside lying near one of the cells, mortally wounded, and died a few minutes thereafter. An examination disclosed two wounds, one on the scalp and one on the back of the neck below the skull, both inflicted by some sharp instrument or instruments, and both fatal. His death was caused by these wounds, which clearly had been inflicted in the struggle near the inside gate. A pocket knife belonging to defendant was found in the yard along the route taken by him as he escaped. Drewry was a larger and more powerful man than Phelps. No prisoner except defendant and Phelps was at any time after 8 o'clock out of his cell, or participated in an effort to escape.

It may be assumed for the purposes of this decision that the evidence fails to sufficiently show that defendant personally inflicted any wound on Captain Drewry or personally assaulted him in the conflict near the inside gate, and that in such conflict he devoted his efforts exclusively to Kerr; and further that it fails to show any express specific agreement between Phelps and himself to *kill* anybody in their previously conceived and concerted plan to escape from the prison. This is a matter of no moment in this case.

The evidence does clearly show that defendant and Phelps had conspired and combined together to commit an unlawful act, viz.: to accomplish *their* escape, the escape of both Phelps and defendant, from the state prison, and in the accomplishment of that purpose to use such force as was found to be necessary. It was such that a jury could not reasonably conclude otherwise. The law made it a felony on the part of Phelps, a prisoner confined in a state prison for a term less than for life, to escape or to attempt to escape therefrom (Pen. Code, secs. 105 and 106), and any person aiding and abetting him in the commission of this felony would be a principal therein. (Pen. Code, sec. 31.) So that it is immaterial here that the law does not make it a crime for one undergoing a life sentence in a state prison to himself escape or attempt to escape. The conspiracy included as a part of the joint purpose the accomplishment of something admittedly unlawful and a felony,—namely, the escape of Phelps. Of course there is no force whatever in the suggestion that defendant could not, by reason of his *status* as a prisoner for life in a state prison, be held as a principal under the provisions of section 31 of the Penal Code. The conspiracy likewise included the commission by defendant of the felony defined by section 109 of the Penal Code, which provides that "any person who willfully assists . . . any prisoner confined in any prison or jail . . . to escape, or in an attempt to escape from such prison or jail . . . is punishable as provided in section 108 of the Penal Code," viz.: by imprisonment in the state prison not exceeding ten years and by a fine. The willful killing of any person standing between defendant and Phelps and the consummation of their escape was an ordinary, probable, and natural consequence of the execution of their common design.

The law applicable in such cases is well stated in *People* v. *Kauffman*, 152 Cal. 331, 334, [92 Pac. 861], where it is substantially said that under the well-settled rule of law governing the criminal liability of each of several engaging in an unlawful conspiracy or combination, if several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. It was further said: "In contemplation of law the act of one

is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the common design for which they combine.'' Of course, as said in the case just referred to, if one member of the party departs from the original design as agreed on by all the members and does an act which was not only not contemplated by those who entered into the common purpose, ''but was not in furtherance thereof, and not the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor.'' But there is no reasonable basis in the evidence for the application of this doctrine here. Not only was the killing of *any* officer or guard standing between defendant and Phelps and their escape a probable and natural consequence of their plan to escape, as that plan is shown by their acts and conduct, but the evidence shows quite clearly that their plan contemplated the overcoming of Drewry and Kerr by such force and to such an extent as was necessary at the very place where they attacked them, and these men having been rendered powerless to resist them or impede their movements, their subsequent escape through the gates into the yard. Under such circumstances, Creeks would be equally guilty with Phelps of the murder of Drewry, even if he did not personally inflict any wound on him, for under the law the acts of Phelps in the matter were the acts of the defendant also. The verdict of the jury in this regard is not only sufficiently sustained by the evidence, but we do not see how any other verdict could have been given. (See, also, *People* v. *Ford,* 25 Cal. App. 388, [143 Pac. 1075].)

4. To the claim that the statement or confession made by defendant very shortly after his recapture was improperly admitted in evidence, it is sufficient to note that the objections made to its introduction were withdrawn by his attorneys, and that it was received in evidence without objection on their part.

5. In view of what we have said as to the rules of law applicable to such a case as this, we find no prejudicial error in the matter of instructions of the court to the jury.

It was proper to instruct the jury that any prisoner confined in the state prison for a term less than life who attempts to escape therefrom is guilty of a felony, to acquaint them with the fact that any conspiracy or combination including among its purposes the accomplishment of the escape of Phelps was a conspiracy for the accomplishment of an unlawful act. The instruction that all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals in the crime, was, as we have seen, a correct statement of the law applicable to this case, as also was the instruction that one who aids, abets, and assists a convict confined in the state prison for a term less than life to escape therefrom is guilty of a felony.

The following instruction was given:

"If a convict is informed of an expected attempt to break or escape from a state prison to be made by a convict confined therein for a term less than life, and his help is sought by said convict so planning it, if he in good faith does not desire to assist therein, it is his duty to report the same to the proper officer of the prison. And if he fails to do so and willingly joins in and aids, abets and assists such escape he is responsible for all the consequences that follow said conspiracy."

This instruction is somewhat loosely drawn and we cannot commend it. The court should not have instructed the jury that it was the duty of a convict informed of a proposed attempt to escape, to report the same to the proper officers of the prison. No question relating to any moral obligation resting on defendant was involved in the issues being tried, and the defendant was violating no law in failing to give information of the proposed escape. But we do not see how, in view of the context, this statement could have prejudiced defendant. It was immediately followed by the statement "And if he fails to do so, *and willingly joins in and aids, abets, and assists* such escape he is responsible," etc. This purported to define the only circumstances under which defendant could be held criminally liable under the facts stated in the instruction, whatever his failure to give such information to the officers. He must go further, and willingly join in, and aid, abet, and assist, etc. It would be

unreasonable to assume that any prejudice resulted to defendant from this instruction.

The instruction stating substantially that if the jury were satisfied beyond a reasonable doubt by the evidence of certain specified things, the defendant must be held guilty of murder, even though he did not personally inflict the fatal wound, correctly stated the law. If, as suggested by counsel, the giving of this instruction "was about the same thing as telling the jury to convict the defendant of the crime charged," this is so only because the evidence so clearly shows the elements essential to conviction as to leave no reasonable doubt of their existence.

The court might well have omitted to read to the jury section 246 of the Penal Code, for it had nothing to do with the case. We are unable to see, however, how it could have misled the jury, or in any way prejudiced defendant's cause.

One or two other instructions complained of require no notice here, as they were unquestionably correct.

Certain instructions requested by defendant were properly refused. The first referred to in his brief did not correctly state the law, inasmuch as it substantially involved the proposition that it was not a crime on the part of one confined in a state prison for life to aid and assist one confined therein for a term less than life, to escape or attempt to escape therefrom. The second requested instruction referred to did not correctly state the law, inasmuch as it declared substantially that defendant could not be convicted of murder unless he actually struck the fatal blow that killed Drewry, or unless it was *specifically agreed* between Phelps and defendant, as a part of a conspiracy to escape "entered" into by them, that they would "kill and murder any one who interfered" with their escape. As we have seen, no such specific agreement to kill was essential to defendant's guilt. The same objection exists as to the third requested instruction referred to.

6. It is claimed that under the rulings of the trial court, defendant was compelled to be a witness against himself, in that on his cross-examination, he was examined, over his objection, as to matters about which he had not testified on his direct examination. On his direct examination he had testified that he was present at the conflict in the corridor, near the inside gate, saw part of the fight between

Phelps and Captain Drewry, saw Phelps strike Drewry, did not participate "in any manner" in that fight, and did not have his hands on Drewry in any way; that at the end of that fight between Phelps and Drewry he picked up from the floor his own knife and a "gun," and that he had last seen this knife in his cell that same evening and had not brought it from there; that he left his cell that evening just ahead of Phelps; that Phelps had his own knife in his hand when they came out of the cell. The whole purpose of his testimony on direct examination was to show that he was in no way a participant in the attack on Captain Drewry, and had absolutely nothing to do with it—that he was in fact an innocent spectator taking no part, so far as his testimony showed, in any attack on either Drewry or Kerr. He did not in his direct examination say anything about his attack on Kerr. The prosecution claimed, and there was considerable foundation for the claim, that not only was defendant a co-conspirator with Phelps in a plan to escape together, using such force as was necessary to accomplish their purpose, but also that in the attack made on the officers, having temporarily disposed of Kerr, he personally took part in the struggle of Phelps with Captain Drewry, who was a larger and stronger man than Phelps, and that with his own knife, already referred to, he inflicted the fatal wound found on the back of Captain Drewry's neck, below the skull.

On cross-examination defendant was asked among other things: "Well, you left the cell with Phelps with the intention of overcoming the guards and escaping from the jail, did you not?" to which he answered "Yes, sir"; "in accordance with the agreement made by you and Phelps before leaving the cell, you struck Kerr," to which he answered "Yes, sir"; "Your object in striking Kerr was to overpower him and aid Phelps in getting out of the prison," to which the answer was, "That was the object under the circumstances."

We are at a loss to see why that was not proper cross-examination, in view of his testimony given on direct examination.

The well-settled rule in this state as to cross-examination of a defendant is stated in *People* v. *Gallagher,* 100 Cal. 475, [35 Pac. 80]. While a defendant in a criminal action or

proceeding cannot be compelled to be a witness against himself, if he offer himself as a witness "he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief." (Pen. Code, sec. 1323.) The statute places no limitation or restriction upon the extent or character of his cross-examination "as to all matters about which he was examined in chief," and upon these matters he may be cross-examined as fully as any other witness. "Any question which would have the tendency to elicit from him the whole truth about any matter upon which he had been examined in chief, or which would explain, or qualify, or destroy the force of his direct testimony, whether it be to give the whole of a communication or transaction of which he had given only a part, or to show by his own admission that he had made contrary statements, or that his conduct had been inconsistent with the statements given in his direct testimony, and thus throw discredit upon them, would be legitimate cross-examination." Again, in *People* v. *Dole,* 122 Cal. 486, 491, [68 Am. St. Rep. 50, 55 Pac. 581], it was said by the late Chief Justice Beatty, a majority of the court concurring in his views, that "any fact may be called out on cross-examination which a jury might deem inconsistent with the direct testimony of a witness, and a defendant testifying in his own behalf is in this respect put upon the same plane with other witnesses." In the light of these declarations, we are of the opinion that no error was committed in allowing this cross-examination. One of the matters regarding which defendant testified on his direct examination was the attack on Captain Drewry near the inside gate, and his own absolute lack of participation therein. The matters called for on cross-examination tended to show that the assault was in fact a joint assault by defendant and Phelps on both Kerr and Drewry, undertaken and carried into execution by them, for the purpose of accomplishing their escape from the prison, and they were of such a nature that the jury might well deem them inconsistent with the direct testimony of the witness as to the part played by him in the encounter near the inside gate, and, under the circumstances shown, even as to his statement to the effect that he did not personally assault Captain Drewry. It was at least very unlikely that in such a joint assault made under such circumstances as were disclosed by the cross-examina-

tion, the defendant, armed with a knife as the jury had the right to conclude from the evidence he was, refrained from assisting Phelps in his struggle with Captain Drewry, when he had the opportunity to do so. The cross-examination thus tended to discredit and destroy the force of the testimony given by defendant on his direct examination as to this very matter.

The question asked defendant on cross-examination, "You knew that Phelps at the time was serving a term in the state prison of less than life" to which he answered, "Yes, sir," was probably not proper cross-examination. However, the allowance of this question was not error sufficiently grave to warrant a reversal. Such knowledge on the part of the defendant was not essential to his guilt as a principal in the matter of the escape or attempted escape of Phelps, or to his guilt under section 109 of the Penal Code, in the matter of willfully assisting "any prisoner confined in any prison . . . to escape," and this being so, we do not see how it could have otherwise prejudicially affected his cause.

We find no other matters requiring notice.

The judgment and order denying a new trial are affirmed.

Shaw, J., Lorigan, J., Melvin, J., Sloss, J., and Lawlor J., concurred.

---

[S. F. No. 7069. Department Two.—June 8, 1915.]

In the Matter of the Estate of SAMUEL PIERCE BOL-LINGER Deceased. EMMA C. BOLLINGER, Appellant, ELMER T. BOLLINGER, LEE F. BOLLINGER, and ARCHIE C. BOLLINGER, Respondents.

Probate Law—Presumption of Community Property—Evidence Countervailing It.—The presumption that the property of a married decedent is community property is a disputable one and the uncontradicted testimony of a son of decedent that all of his property at the time of his death was acquired prior to his second marriage, is sufficient to sustain a finding that the property was his separate property.

Id.—Objection to Form of Evidence—Must be Taken at Trial.—An objection to the form of such testimony, pertinent to the issue,

should have been taken at the trial in order to render the question reviewable on appeal.

ID.—COMMUNITY PROPERTY—CONSTRUCTION OF GENERAL RELEASE—ADMITTED FOR LIMITED PURPOSE.—A contract in the form of a general release executed by the decedent and the widow within one month prior to his death, although not properly to be construed as affecting community property in probate proceedings as opposed to proceedings in divorce, is nevertheless admissible in probate proceedings for the limited purpose of showing that there had been negotiations as to property rights prior to the divorce proceedings, and that in such negotiations, no mention had been made of community property.

ID.—EFFECT OF DECREE OF DIVORCE DETERMINING SAME.—The finding of the probate court that there was no community property is amply supported by the divorce proceedings in which the complaint of decedent alleged that there was no community property, and the answer was a general denial and the court found and the interlocutory decree of divorce, from which no appeal was taken, recited there was no community property.

ACTION OF DIVORCE—PLEADING—FINDINGS.—In an action of divorce an allegation that one spouse took title to property as community property is sufficient upon issue joined, if proved, to support a finding to that effect, and an allegation that there was no community property is sufficient under similar circumstances to support a negative finding on that issue.

ID.—FINDINGS—CONCLUSION OF LAW.—The question of whether a finding of nonexistence of community property is a conclusion of law cannot be raised for the first time in this court by one who did not demur to the complaint, but joined issue on all of its allegations.

APPEAL from a decree of distribution of the Superior Court of Alameda County.   William S. Wells, Judge.

The facts are stated in the opinion of the court.

L. H. Honey, J. G. Reisner, H. W. Brunk, and Wm. O. Minor, for Appellant.

F. I. Lemos, and Philip M. Carey, for Respondents.

MELVIN, J.—Emma C. Bollinger, widow of Samuel Pierce Bollinger, appeals from a decree distributing his estate to his three children by a former marriage, who are the legatees and devisees mentioned in his will.

Appellant contends that the evidence before the probate court was not sufficient to overcome the presumption that all property in the possession of the testator at the time of his death was community property. Conceding that the presumption which appellant invokes does attend the possession of property by either spouse (*Meyer* v. *Kinzer*, 12 Cal. 253, [73 Am. Dec. 538]; *In re Bauer*, 79 Cal. 308, [21 Pac. 759]), such presumption is a disputable one (*Freese* v. *Hibernia Sav. and Loan Society*, 139 Cal. 394, [73 Pac. 172]), and in the present proceeding the proof was clear and ample that Mrs. Bollinger had no community interest in the property of which her husband was possessed at the time of his death.

The court's conclusion that all of the property of the estate was testator's separate property was supported by the testimony of one of his sons, who swore that the real property involved in this dispute was owned by his father prior to the latter's marriage to Emma C. Bollinger. The son also testified that at the time of his father's marriage to Emma C. Bollinger the former was worth eighteen or twenty thousand dollars, with the real estate; that all of this property was acquired by the father of the witness before his marriage; that he did not become insolvent after marriage, and that he kept the property as his own. (At the time of testator's death the estate was valued at $12,670.80.) The testimony of this surviving son was uncontradicted.

To appellant's statement that this evidence was hearsay, containing merely conclusions of the witness, and not the best evidence, respondents reply that no such points were made at the hearing, counsel for appellant contenting themselves with the stock objection that the testimony sought was "incompetent, irrelevant and immaterial." We think this answer is sufficient. The evidence was clearly pertinent to the issue involved, and if objectionable in the form in which it was offered, the ground of objection should have been clearly specified. The mere fact that it was oral did not render it inadmissible. (*Killian* v. *Killian*, 10 Cal. App. 318, [101 Pac. 806].)

There was also introduced at the hearing of the petition for distribution a document regularly acknowledged by Emma C. Bollinger, whereby for valuable considerations she admitted full payment, satisfaction, settlement and adjustment of all claims and demands of every description against Samuel P.

Bollinger. The acquittance also contained this language:
"I do hereby waive and surrender, release and acquit said
Samuel P. Bollinger from any and all claim, demand, obliga-
tion and indebtedness, in the present or future from or on
account of any reason, cause or condition, judgment or
decree, by reason of anything that has happened between us
or rising or growing therefrom, absolutely and uncondition-
ally." This instrument was dated less than a month prior
to the death of Mr. Bollinger. Appellant construes this writ-
ing as a waiver of claims against her husband personally
and not as a disclaimer of all interest in his estate, citing
in this behalf *Jones* v. *Lamont*, 118 Cal. 499, [62 Am. St.
Rep. 251, 50 Pac. 766]. Courts have been unwilling to ex-
tend the scope of releases of this sort in such manner as to
hold them applicable to community property in contests aris-
ing not in actions for divorce, but in probate proceedings,
and if the finding with respect to such property in the pro-
ceeding before us were based upon a construction of the
contract of waiver alone we would probably reverse the judg-
ment. But we need not construe the language of the agree-
ment at all. It was admissible in evidence as a part of the
showing that there had been negotiations with respect to
property rights between Mr. Bollinger and his wife before
the action for divorce was instituted and that in those nego-
tiations there had been no mention of community property.
For this limited and negative purpose the contract was rele-
vant and material.

But if there could be any doubt of the sufficiency of the
evidence heretofore discussed, to support the award of all
the property according to the terms of the will, it would be
dispelled upon inspection of the pleadings, findings, and judg-
ment in the divorce action which were introduced in evidence
at the hearing in the probate court. In his complaint for
divorce Mr. Bollinger alleged that there was no community
property belonging to the parties to the action. The answer
of Mrs. Bollinger was a mere general denial. The court
found and the decree recited that there was no community
property. The testator died in less than three weeks after
the entry of the interlocutory decree. As no evidence that
there had been any appeal from the interlocutory judgment
was offered, we must hold that the property rights had be-
come finally and irrevocably settled upon the expiration of

six months from the entry of the interlocutory decree. (Civ. Code, sec. 131; *Huneke* v. *Huneke,* 12 Cal. App. 199, [107 Pac. 131].) But appellant's counsel say that the allegation that there was "no community property belonging to the parties to this action" was the statement of a mere conclusion of law; that the finding based upon such conclusion of law was of no force; that in the absence of any issue as to property rights the divorce action abated upon the death of plaintiff, and that the property rights must be settled by subsequent proceedings. This contention is without merit. An averment that one spouse took title to property as community property is sufficient upon issue joined, if proved, to support a finding to that effect, and an allegation that there was no community property would, under like circumstances, support a negative finding such as we have in this case. (*Killian* v. *Killian,* 10 Cal. App. 318, [101 Pac. 806].) But even if we concede that the finding of the nonexistence of community property is really a conclusion of law, appellant, who did not demur to the complaint but joined issue on all of the allegations thereof, may not raise the question for the first time in this court.

No other alleged errors require attention.

The judgment is affirmed.

Henshaw, J., and Lorigan, J., concurred.

---

[S. F. No. 6420.    Department Two.—June 8, 1915.]

## EDWARD H. HORTON, Respondent, v. REMILLARD BRICK COMPANY (a Corporation), Appellant.

CONTRACTS—PERSONAL SERVICES—BONUS ON ANNUAL PROFITS.—One who enters the service of a corporation for a term of years under a contract determining his salary and providing that in addition he shall receive a bonus upon the yearly profits of the business, varying according to the extent of the profits, is entitled to recover a bonus computed upon the business at the end of the first year, notwithstanding that the services are terminated before the time limited in the contract and that he had not requested such bonus after a number of years' services until the cessation of his employment.

Id.—Depreciation.—As a basis of such calculation the inventory made up in part by the various employees of the company, following the custom used by the company for many years, was held sufficient in the light of the evidence before the court, and there was no error in not including in such inventory an item of depreciation under the circumstances here shown.

Id.—Estimated Profits.—Under the contract shown the profits referred to are construed to be estimated profits.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. William H. Waste, Judge.

The facts are stated in the opinion of the court.

Sullivan & Sullivan and Theo. J. Roche, for Appellant.

Wright, Wright & Stetson, for Respondent.

THE COURT.—Upon consideration of the petition for the hearing of this cause before this court, after decision in the district court of appeal, this court, while well satisfied with the soundness of the reasoning and conclusions reached by the court of appeal, in all other respects, considered one question of sufficient gravity to justify further consideration of it here. That question was whether under the terms of the contract between Horton and the defendant the profits were to be the *actual* profits, or whether by convention and agreement it was understood that the profits should be *estimated* profits. The point becomes one of great importance in the case because it was shown that, while in the statement estimating the profits the bricks of defendant carried over into the year 1908 were appraised at cost, they were, owing to business depression, sold for much less than cost in 1908. We are, however, convinced that the court of appeal was right in the conclusion it reached upon this question, and that under their contract the parties agreed to an annual estimate of profits as the basis of plaintiff's claim for compensation. The opinion and decision of the district court of appeal is therefore adopted as the opinion and decision of this court, and the judgment and order appealed from are affirmed. The opinion and decision is as follows:

"Chipman, P. J.: This is an action to recover a certain share of the net profits earned by defendant in its business

for the year 1907 and is based upon a written contract be-
tween plaintiff and defendant bearing date December 14,
1906.   The essential part of this contract reads as follows:
   " 'The party of the second part agrees to enter the employ-
ment of the first party and to continue such employment until
the 14th day of December, 1916, he to discharge such duties
as may reasonably be required of him by the directors of first
party; second party agrees during the said period to devote
his time during business hours, his best abilities and energies
to the business interests of the first party; first party hereby
agrees to employ second party for said period and as com-
pensation for such services to be so rendered first party prom-
ises to pay to second party a monthly salary, same to be at
the rate of three hundred dollars per month, from date hereof
to the 1st day of January, 1907, and thereafter at the rate
of five hundred dollars per month, same to be paid at the
end of each current month, first party further agrees in addi-
tion to the monthly salary as hereinbefore specified to pay to
second party for further compensation for such services a
bonus upon the yearly profits, if any, of the business of the
first party, after December 31st, 1906, that is to say, if com-
mencing January 1st, 1907, the annual net profits on the
capital invested in the business of party of the first part
equals twelve per cent, party of the first part agrees to forth-
with pay unto party of the second part a bonus of twelve
hundred dollars, and if.such annual profits exceed said twelve
per cent, then the bonus to be paid by first party to second
party shall in addition to said twelve hundred dollars be the
sum of six hundred dollars for each additional one per cent
profit above said twelve per cent.   It being understood and
agreed that as a basis for the estimation of said profits the
capital invested in the said business shall be taken at the
sum of four hundred and eight thousand one hundred and
sixty-seven dollars in accordance with inventory as shown by
the closing of the books of said business December 31st,
1905.'
   "The cause was tried by the court without a jury and judg-
ment passed for plaintiff for the sum of four thousand eight
hundred dollars, with interest from January 1, 1908.   De-
fendant appeals from the judgment and from the order deny-
ing its motion for a new trial.