[Crim. No. 2331. In Bank.—June 13, 1921.]

THE PEOPLE, Respondent, v. DAVID CLIFTON, Appellant.

[1] CRIMINAL LAW—MURDER—EXTENT OF INTOXICATION—EVIDENCE.— In this prosecution for murder, the evidence is held insufficient to show that defendant was intoxicated to such an extent as to render him unconscious of, or without appreciation of, the nature of his act, and incapable of forming a deliberate intent to kill.

[2] ID.—INTENT—INTOXICATION—INSTRUCTION.—Where in a prosecution for murder there was evidence of defendant's intoxication

at the time of the homicide, the jury was correctly instructed that to constitute murder in the first degree, the unlawful killing must be accompanied by a deliberate and clear intent to kill, and that it was proper to consider the evidence on the subject of intoxication at the time of the act, together with all the other evidence, for the purpose of determining the intent with which the act was committed.

[3] ID.—EVIDENCE—BURDEN OF PROOF—ALLEGATIONS OF INDICTMENT—INSTRUCTION.—An instruction in a prosecution for murder that every material allegation of the indictment was put in issue by the plea of not guilty, and that it devolved upon the prosecution to establish to a moral certainty and beyond all reasonable doubt each material fact so alleged, is not subject to the claim that it was in substance an instruction to the effect that the allegations of the indictment are facts, and that they are true.

[4] ID.—EVIDENCE — CROSS-EXAMINATION OF DEFENDANT — IMPEACHMENT—RIGHT OF STATE.—In a prosecution for murder, the prosecution has the right, under section 1323 of the Penal Code, to fully cross-examine the defendant as to all matters concerning which he was examined in chief, and in so doing may show by his own admissions that he has made statements contrary to those made upon his direct examination for the purpose of throwing discredit upon them.

[5] ID.—ADMISSIONS OF DEFENDANT—PROOF UPON DENIAL.—Where in such a prosecution the defendant fails to admit the making of contrary statements, proof of the making of the same may be made by other persons who heard them, unless the same constitute a confession of guilt of the offense for which the defendant is on trial, in which event they would not be admissible in the absence of proof of being voluntarily made.

[6] ID.—ADMISSIONS OF DEFENDANT—ADMISSIBILITY OF.—In such a prosecution, admissions of the defendant of material facts not amounting to a confession of guilt are admissible, regardless of the question of impeachment.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ralph W. Smith for Appellant.

5. Admissibility of improper or involuntary confession to impeach defendant in criminal case, notes, 17 Ann. Cas. 872; 9 A. L. R. 1358.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

ANGELLOTTI, C. J.—The defendant was convicted of murder of the first degree for the killing of one Henry Smith on April 9, 1920, and was adjudged to suffer death. He appeals from the judgment and from an order denying his motion for a new trial.

The killing was admitted, but it was claimed on the trial that it was done in lawful self-defense. In view of the record it cannot reasonably be contended that the jury was not justified in concluding otherwise and finding the defendant guilty. It is earnestly urged, however, that the evidence was not such as to justify a verdict of murder of the first degree, for want of testimony to support a conclusion of the presence of the deliberation and premeditation essential to such a verdict.

[1] While there was evidence which would strongly justify a claim before the jury that the homicide was the result of a drunken quarrel between defendant and deceased, without any element of deliberation and premeditation on the part of defendant, there was, in our opinion, sufficient evidence upon which to found a contrary conclusion. Deceased and defendant and two women, all negroes, were living in a small four-room shack, fronting on an alley between O, P, Fourth, and Fifth Streets, in the city of Sacramento. Apparently all were ignorant and superstitious. Deceased was living with one of these women, a Miss Fisher, and the other woman, a Miss Watson, had been an occupant of the house for only a few days. The relations between defendant and deceased had been very friendly, so far as the evidence shows, to within a couple of days of the quarrel, and defendant had originally taken up his abode in the house at the invitation of deceased. The only evidence of any trouble between them prior to the fatal quarrel was that of Miss Watson. She testified to a verbal altercation between them a day or two before with relation to the defendant carrying and using red pepper as a protection against evil spirits in and about the house, which ended in defendant drawing a knife, and being pushed out through a door by Miss Fisher. She also testified that the day before the homicide deceased accused Miss Fisher, in

the presence of defendant, of giving defendant money and taking care of him out of his (deceased's) labor. She said that he also told Miss Fisher to make defendant leave the house and that he would not stay there if defendant remained. She also testified that during the morning of the day of the homicide defendant sharpened his knife in her room and, after sharpening it, said it would do the work. In none of these statements was she corroborated by other witnesses, and her evidence may well be claimed to be somewhat rambling and unconvincing. The question of her credibility was, however, a question for the jury. Later in the day defendant and deceased, both of whom had apparently been drinking previously, together with a white man called "Pat," who has never been produced as a witness, were in the dining-room of this house, engaged in drinking and talking. According to defendant, a quarrel commenced between him and deceased on the question as to which of the two should go out after more liquor, and deceased attacked him with a butcher-knife, but there is nothing except this testimony of defendant to suggest that deceased had a knife or was armed. The evidence was such as to fully warrant the jury in concluding that he was unarmed. No witness professes to have seen the commencement of the physical encounter. The two who say they witnessed any part of the encounter, a negro named Miller and Miss Watson, found the two grappling on the floor of the room, Miss Watson saying that defendant was on top of deceased and that deceased was pleading with him to stop cutting him, and Miller saying that each man was on his side. According to both of the witnesses deceased was then bleeding badly. The defendant then got up and left the house and was arrested a short time thereafter in the immediate locality, near the corner of Fifth and P Streets, where he was standing against a fence. The knife, with blood upon it, was found in his pocket. Deceased, who died the same day, had received several small knife wounds, one being between the thumb and index finger of his left hand, and a mortal wound about nine inches in length across the abdomen, portions of the small intestines being severed. The case was such, assuming the reliability of Miss Watson as a witness, as to warrant a conclusion that there was some feeling of hostility between the two men, and

a disposition on the part of defendant to use his knife on deceased, and also that defendant attacked deceased with his knife, deceased being unarmed, and inflicted the abdominal wound with the deliberate purpose of killing. If this wound was consciously inflicted, it is hard to account for the act upon any other theory than that it was done with the deliberate purpose of killing, for the nature of the wound was such that it was most likely to result in death. That it was consciously inflicted seems very clear, unless defendant was intoxicated to such an extent that he did not know and appreciate what he was doing. The strongest evidence in defendant's behalf is that relating to his intoxication. Unquestionably he was under the influence of liquor to some extent. All those who had anything to do with him that afternoon, including the officers, agree on this. The question in this connection is whether he was intoxicated to such an extent as to render him unconscious of or without appreciation of the nature of his act and incapable of forming a deliberate intent to kill. We are forced to the conclusion that the evidence was such as to sufficiently support a negative answer to this question. [2] The jury was correctly instructed that to constitute murder in the first degree, the unlawful killing must be accompanied by a deliberate and clear intent to kill, and also that it was proper to consider the evidence on the subject of intoxication at the time of the act, together with all the other evidence in the case, for the purpose of determining the purpose or intent with which he committed the act. It found the existence on the part of defendant of this deliberate and clear intent. While in this respect the case may be one that may merit earnest consideration on the part of the executive upon an application for executive clemency, it is not one in which this court is authorized to reverse for want of sufficient legal evidence.

[3] The claim that an instruction that every material allegation of the indictment was put in issue by the plea of not guilty, and that it devolved upon the prosecution to establish to a moral certainty and beyond all reasonable doubt *"each material fact so charged"* was in substance an instruction to the effect that the allegations of the indictment *"are facts and true,"* is, it would seem hardly necessary to say, entirely without foundation.

Defendant testified as a witness in his own behalf. Among other things he testified that there had never been any trouble between himself and deceased prior to the fatal quarrel, and especially that there had never been any trouble or feeling between them with regard to the woman Fisher. He also testified that the deceased attacked him with a knife, "with a keen butcher-knife," "a little keen butcher-knife that was wrapped around the handle with some string," which he, defendant, knocked out of his hand. On cross-examination the foundation was properly laid with a view to his impeachment as a witness in regard to these matters by asking him if at the city jail about 2:25 P. M. of April 9, 1920 (the day of the homicide), in the presence of certain specified persons, he did not give certain answers to certain questions. The questions and answers involved were as follows:

"Q. What did the fight start over?

"A. God! His woman, I guess. That was the only thing it started over.

"Q. What is the woman's name?

"A. Miss Cora Fisher.

"Q. Dave, did you get cut anywhere?

"A. No, sir, not to my knowledge; no.

"Q. Henry didn't have a knife out or anything.

"A. Not that I know of.

"Q. Did he have a gun or anything?

"A. No, sir.

"Q. Did he say he was going to get a gun or anything?

"A. No, sir, he didn't. A. Yes, sir.

"Q. Did Henry have a knife or anything in his hand?

"A. No, sir, I don't remember."

Defendant answered that he did not remember making any statement. In rebuttal, Mr. Vinson, the official shorthand reporter who took down the questions and answers in shorthand, testified to the giving by the defendant of these answers to such questions on the occasion specified. Objection was made to this evidence on the part of Mr. Vinson on the ground, substantially, that it was not made to appear that the statement was voluntary or that defendant was apprised of his rights, and that his condition was such that he was not able properly to understand the questions and know the statements he was making. There was

considerable testimony as to his condition with regard to being intoxicated and the extent thereof, but the evidence before the court was clearly of such a nature as to warrant the conclusion that he sufficiently understood the questions and the answers he was giving. It is contended that the court erred in admitting the evidence thus given by Mr. Vinson.

[4] There can be no question, of course, as to right of the prosecution to fully cross-examine the defendant as to all matters concerning which he was examined in chief (Pen. Code, sec. 1323), and in so doing to show by his own admissions, if they could, that he had made statements contrary to those made upon his direct examination, for the purpose of throwing discredit upon them. (See *People* v. *Gallagher,* 100 Cal. 466, 475, [35 Pac. 80] ; *People* v. *Creeks,* 170 Cal. 368, 379, [149 Pac. 821].) [5] It seems plain on principle that in the event of his failure to admit the making of such contrary statements, when properly questioned as to the same, proof thereof might be made by other persons who heard him make them, just as in the case of any other witness. This is certainly true if such statements do not constitute a confession of guilt of the offense for which the defendant is on trial, in which event it may be assumed for the purposes of this decision that the same would not be admissible in the absence of proof of being voluntarily made. The trial court admitted proof of the statements here involved for the purpose of impeachment, without proof of their voluntary character. But it is perfectly clear that they did not constitute a confession of guilt, within the meaning of the rule requiring such proof. The distinction between a confession of guilt and a mere admission of a fact or facts not constituting guilt of the offense in question is very fully and learnedly discussed in *People* v. *Fowler,* 178 Cal. 657, 664, [174 Pac. 892], and need not here be further discussed. [6] These statements, being mere admissions of material facts not amounting to a confession of guilt, were also admissible as such altogether regardless of any question of impeachment. (See *People* v. *Sexton,* 132 Cal. 37, 39, [64 Pac. 107].) As we have said, the evidence was clearly sufficient to warrant the conclusion of the trial court that he was not so incapaci-

tated by intoxication that he did not sufficiently understand the questions asked and the answers he gave.

It is argued that the trial court erred in refusing to give an instruction requested by defendant "that before you can consider the statement made by the defendant at the city jail on April 9, 1920, in reply to questions of Mr. Hughes . . . in the presence of the police officers and Mr. Vincent, the reporter, or any part thereof, the evidence must show to your satisfaction that the accused, David Clifton, was at the time of the making of the statement in possession of his mental faculties, and was so possessed to understand the questions which he answered. Should you find that the defendant was not so possessed of his faculties by reason of his having been drinking liquor, or any other cause, then you are to disregard the evidence as to those portions of the statement concerning which defendant was examined on the witness-stand and which have been admitted in evidence."

As an abstract statement of law we see no very good objection to this instruction, and, in view of the evidence as to some intoxication on the part of the defendant, it might well have been given. However, one of the grounds upon which the learned judge declined to give it was that "there is not sufficient evidence, if any, on which to produce such an instruction," and it is true that there is no affirmative evidence in the record tending to show lack of understanding on the part of defendant of the purport of the questions and his answers. The answers of the defendant were responsive to the questions and indicated comprehension of the subject of inquiry. In view of the character of the answers given it is difficult to imagine that defendant did not fully understand both questions and answers. Every witness who testified regarding the matter testified that although the defendant was somewhat under the influence of liquor, he apparently sufficiently understood and intelligently answered the questions. Under the circumstances we think it cannot be held that the trial judge erred in refusing the instruction for the reason above stated, and on which, among others, he founded his refusal.

No other point is made for reversal, and careful consideration of the record shows nothing in the way of substantial error in the proceedings in the trial court. De-

fendant had a fair trial, and there is sufficient evidence to support the verdict.

The judgment and order denying a new trial are affirmed.

Shaw, J., Wilbur, J., Olney, J., Lennon, J., Lawlor, J., and Sloane, concurred.