[Crim. No. 3304. First Dist., Div. One. June 20, 1957.]

THE PEOPLE, Respondent, v. DONALD B. KEELING, Appellant.

6

Howard W. Wayne, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, John S. McInerny, Deputy Attorney General, F. J. Coakley, District Attorney (Alameda) and Frank Vukota, Deputy District Attorney, for Respondent.

BRAY, J.—Defendant appeals from a judgment of conviction, after jury trial, of murder in the first degree with life imprisonment, and from the order denying new trial.

### QUESTIONS PRESENTED
1. Insufficiency of evidence to show premeditation.
2. Error in giving and refusing instructions.
3. Alleged misconduct of the district attorney.
4. Admission of immaterial evidence.

### 1. EVIDENCE.

The victim of the homicide, Leon Ward, was in "Uncle Tom's Cabin" bar drinking at a time when defendant came in. Apparently there was no conversation between them at the time. Ward left for a few minutes, returning just after

midnight with a Mrs. Davidson. Shortly thereafter an altercation took place between Ward and defendant. Only one blow was struck between them, Ward hitting defendant in the area of the mouth. The blow staggered defendant, loosened two front teeth and caused his mouth to bleed. Defendant went into the washroom to clean his face. William Bates, a customer, brought a towel to him. Defendant told him he would get even with Ward even if he had to go to jail for it. After several minutes defendant left the premises. He went to his hotel a short distance away, obtained his room key from the clerk and went up in the elevator with the clerk to his room floor. After getting his knife in his room, he rang for the elevator. He came down with the clerk, giving him the room key. Defendant then returned to the bar, having been gone only 10 or 15 minutes. Seeing Ward seated at a table with Mrs. Davidson, he walked over to him and stabbed him with a knife. His first thrust was the fatal one, over the shoulder of the sitting victim into the chest and through the heart. Defendant then stabbed Ward twice in the back. Ward fell and died almost instantly. As defendant watched Ward, defendant said, "Die, you son-of-a-bitch, die like a dog. This is the price you will have to pay for knocking two of my teeth out." Defendant remained quietly in the bar until the arrival of the police. To them he stated, "I did it, and I hope the son-of-a-bitch dies," and in answer to a question, "It was probably premeditated because I went back and got the knife." He explained that he had been in an argument with Ward who hit him in the mouth; he became angry and obtained from his room his knife with which he stabbed Ward.

At the trial defendant remembered his actions on the fatal day up to the time he first entered the bar, but denied any recollection of anything that happened, other than having a few drinks there, until he found himself getting into a patrol wagon outside the tavern. He remembered being questioned at the Hall of Justice but did not remember being questioned at the scene nor seeing there the officer who questioned him. He remembered some of the statements given by him at the Hall of Justice, but did not remember others of them, but admitted he could have made them. Two officers testified that he described certain events immediately preceding and subsequent to the scuffle and stabbing, which on the stand he claimed he could not recall. He admitted owning a knife similar to the murder weapon.

He testified to his drinking habits, usually two "boiler-makers" (a bottle of beer and a shot of whiskey) before work and three or four more after work. He was a customer of Uncle Tom's Cabin almost nightly. The fatal day he had a "few drinks" on his way to work. While working for the Southern Pacific Company as a mail and baggage handler from 1:15 p. m. to 9:15 p. m. that day he consumed a good part of a half pint of whiskey between 1 and 5 p. m. and the same of a pint of whiskey between 5 and 9 p. m. He was not drunk but was "feeling pretty good," "feeling pretty high." Two of his coworkers who he stated had drunk with him a portion of the two bottles of whiskey denied doing so. They had not smelled alcohol on his breath while at work. Bates, a van driver who was in the bar at the time of the killing, a police officer and a police inspector, the bartender, the hotel elevator man who took defendant up to his room when he secured his knife, testified that defendant did not appear to be drunk, although under the influence of liquor.

Dr. Lewis McKeever, a psychiatrist called by defendant, answered certain hypothetical questions. He stated that a blow of sufficient force to loosen teeth could impair the ability to reason and premeditate, which impairment could last 15 minutes or longer. The possibility of such impairment would be greater if a person was under the influence of alcohol with the factor of anger being an additional impairing element. The ability to reason would depend upon the degree of each factor. A person of the drinking habits described would suffer deterioration of the brain which would cause such person to be more susceptible to loss of reasoning power. The hypothetical person concerning whom the witness was examined could be in a state of "partial consciousness or clouded consciousness" where he might be acting as if he had most of his conscious functions but actually be acting without his normal conscious functions and without ability to premeditate and control his acts. However, the witness admitted that he was talking in possibilities and that the hypothetical person possibly could also premeditate and reason.

It was stipulated that three hours after the homicide defendant had a blood alcohol content of .229 per cent. Death by alcoholic consumption is expected where the percentage reaches .5 per cent. Dr. Ortega testified that blood alcohol content in excess of .15 per cent is considered sufficient to render a person under the influence of alcohol. With a .229 per cent a person could not do anything requiring a high degree of

coordination. He could still reason except the process would be somewhat affected. Three witnesses testified to defendant's good reputation for peace and quiet.

 Defendant's contention that the evidence does not support the conviction in that it fails to show premeditation boils down practically to his claim that because of the amount of alcohol found in his system it must be determined as a matter of law that he was unable to form the intent required for first degree murder. However, it cannot be so determined, particularly under the circumstances of this case. Even defendant's own expert admitted the possibility of a person in defendant's condition being able to premeditate and reason, while Dr. Ortega's testimony was to the effect that he could still reason although the process would be somewhat affected. Defendant's acts show almost conclusively that in spite of the alcohol in his system he reasoned and premeditated. Defendant after being struck and retiring to the rest room expressed a disposition towards revenge; he walked several blocks to get his knife. After stabbing his victim he expressed satisfaction with his action and wished his victim dead. After the stabbing he admitted to police he did the act and stated he "went back and got the knife." The fact that he deliberately went for a knife, walked a few blocks to get it, apparently acted normally in going to and from his room in the elevator, and the method of attack, are significant. Defendant did not slash wildly or without aim. It took considerable deliberateness to strike the victim in the heart by leaning over his shoulder. Defendant's coordination at that time, and all the circumstances, demonstrate a choice and a plan of conduct which was carried out to obtain revenge, and were inconsistent with a conclusion that defendant did not premeditate or know what he was doing.

We are only concerned with first degree murder as defined in Penal Code, section 189, as "any other kind of wilful, deliberate, and premeditated killing . . ." "Deliberation" has been defined as something which is unhurried and arrived at as a result of thought and weighing of considerations, both for and against doing an act. "Premeditate" means to revolve in the mind before hand, to contrive and design previously. (*People* v. *Bender* (1945), 27 Cal.2d 164, 183 [163 P.2d 8]; *People* v. *Nichols* (1948), 88 Cal.App.2d 221, 228 [198 P.2d 538].) Deliberation and premeditation may be inferred from proof of circumstances which will furnish a reasonable foundation for such an inference. (*People* v.

*Guldbrandsen* (1950), 35 Cal.2d 514, 519 [218 P.2d 977]; *People* v. *Cole* (1956), 47 Cal.2d 99, 106 [301 P.2d 854].) ▓ And the requisite malice required for murder is demonstrated when the evidence shows a deliberate intention to take the life of another human being. (*People* v. *Greig* (1939), 14 Cal.2d 548, 561 [95 P.2d 936].) ▓ "It is 'the exclusive province of the jury to determine from the evidence whether the killing was the "wilful, deliberate and premeditated" act of defendant.' [Citation.] However, 'as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict.' [Citation.] This court may not, in reviewing the evidence, substitute its judgment for that of the jury, and, where there is substantial evidence in support of the jury's verdict, its determination must be upheld. [Citations.]" (*People* v. *Eggers,* 30 Cal.2d 676, 685 [185 P.2d 1]; see also *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21].) ▓ The evidence amply meets all the above tests and was more than legally sufficient to support the verdict.

There is no resemblance between the facts of this case and those of *People* v. *Griggs,* 17 Cal.2d 621 [110 P.2d 1031], and therefore the case is not applicable here. There were no eye-witnesses to the killing, and the physicians appointed by the court reported the defendant to be a chronic alcoholic and even insane. Nor is the situation one like in *People* v. *Holt, supra,* 25 Cal.2d 59, where the circumstances of the killing were inconsistent with a deliberate intent to kill. In the Holt case, as pointed out by the court, page 92, the moment the deceased stopped advancing towards the defendant, the latter who had shot twice, stopped shooting even though there were eight loaded cartridges still in his rifle, and permitted the victim to proceed without further molestation. Contrast that situation with defendant's actions.

2. INSTRUCTIONS.

(a) *Voluntary intoxication and unconsciousness*

Defendant does not question the correctness of the instructions given on the subjects of voluntary intoxication and unconsciousness, as far as they went, but contends that they did not cover his situation in that they did not distinguish between the effects of acute voluntary intoxication and the effect of long term overindulgence which leaves the brain

damaged and predisposed to black out upon a blow to the head. The court cited somnambulists and persons suffering from delirium of fever as among those protected by the defense, but did not add those rendered unconscious by a blow on the head or the other factors which defendant claimed the evidence showed.

We deem it unnecessary to determine whether as contended a person may be excused from the commission of a crime, if committed while unconscious from a condition brought about by long continued voluntary use of alcohol[1] for the reason that no instructions were requested by defendant on this subject.[2] The court after stating the presumption of consciousness which follows from a person's acting as if conscious, instructed: "This presumption, however, is disputable, and may be overcome or questioned by evidence to the contrary, and, if you should find that the defendant committed an act which if he was conscious would have constituted the crime charged against him or have been an element of that crime, and if you should not be convinced beyond a reasonable doubt that he then was conscious, you shall find that he was unconscious."

Defendant contends that the evidence would have supported a finding that defendant at the time of the killing was acting unconsciously, his unconsciousness being caused by any one of four conditions: (1) by acute intoxication; (2) by the blow and anger not caused but possibly "triggered" by the alcohol; (3) a preexisting mental defect plus the trauma, both "triggered" by the alcohol; and (4) a mental condition due to chronic alcoholism. Therefore, contends defendant, the court should have instructed of its own motion and without any request or suggestion from defendant, on all of these possible conditions. It is very doubtful that there was substantial evidence to support unconsciousness on any of these theories. While the psychiatrist discussed a hypothetical person who might have been influenced by some of these conditions (as the witness testified, he was only giving testimony

---

[1]It should be noted that *People* v. *Anderson*, 87 Cal.App.2d 857, 860 [197 P.2d 839], holds that unconsciousness due to a heart condition aggravated by the defendant's voluntary intoxication could not be an excuse for the commission of a crime.

[2]See *People* v. *Guthrie*, 113 Cal.App.2d 720, 722 [248 P.2d 947], for an instruction on this subject. But see also *People* v. *McNichol*, 100 Cal. App.2d 554, 555 [224 P.2d 21], which may be inconsistent with the rule there set forth.

12

"concerning possibilities") defendant's basic defense was intoxication to the point of inability to premeditate and then a general claim that the victim was at fault. The record fails to show that "unconsciousness" was in any way urged as a basic defense. To expect a trial court under the circumstances of this case to prepare instructions upon the complex matters which defendant now urges, would be putting an unusual and unrequired burden on the court. ■ Generally, where the court gives the usual proper instructions upon voluntary intoxication and unconsciousness, if defendant desires further instructions upon the subject it is his duty to offer them.[3] (See *People* v. *Reinschreiber*, 141 Cal.App.2d 688, 699 [297 P.2d 658].)

(b) *Admissions and Confessions*

■ Defendant admits that the instructions on this subject were correct but contends that when the court told the jury to view with caution testimony as to oral or written admissions or confessions by defendant, it should have told the jury there were no written admissions or confessions in evidence, and also that the jury should have been told to disregard admissions if made while defendant was not possessed of his faculties by reason of intoxication "or for other reason." Officer Barbeau, who arrived at the bar almost immediately after the stabbing, testified to questioning defendant and stated that defendant told him "It was probably premeditated because I went back and got the knife." On cross-examination defendant brought out that the officer then and there had written in his notebook the statements made to him by defendant, that he read the statements to defendant, then gave the notebook to him to read and asked him to sign it. Defendant looked at it and signed it. Thus, the contents of the statement were in evidence although the writing itself was not. In his argument, defense counsel referred to the statement

---

[3]It is very doubtful that even if defendant had offered an instruction on unconsciousness the court would have been required to give it. Defendant's actions before, during and after the killing completely refute his own statement that he "blacked out." (See *People* v. *Clifton,* 186 Cal. 143, 150 [198 P. 1065], and *People* v. *Coston,* 82 Cal.App.2d 23, 40 [185 P.2d 632].) *People* v. *Griggs, supra,* 17 Cal.2d 621, is not in point here. There the court was discussing a situation where the defendant was not only a chronic alcoholic but was suffering from mental deterioration or aberration. The court said: ". . . when insanity is the result of long continued intoxication it affects responsibility in the same way as insanity which has been produced by any other cause." (P. 625.) In our case there was no evidence of chronic alcoholism, mental deterioration, aberration or of insanity.

containing the word "premeditation" and said that the written statement was not in evidence. Replying thereto the deputy district attorney in his closing argument stated that defendant "was handed a statement. He read the statement and signed it and made no changes, and when counsel tells you that statement is not in evidence he isn't telling you the truth. It is down in here in black and white and it is part of the People's case and you can have it read to you if you so desire." Literally, the district attorney's statement is correct. Defendant's statement to the officer was in evidence although the signed writing thereof was not. Defendant contends that because the writing itself was not in evidence the court should have told the jury when discussing admissions that there were no written admissions in evidence. Neither at the time the district attorney made the above mentioned statement nor at any time did defendant request the court to inform the jury that the notebook statement was not in evidence. The fact that the testimony showed that defendant made a written admission or confession and its contents made the court's instruction correct. In any event, the failure of the court without a request to instruct that no writing was in evidence could not be error. (See *People* v. *Holbrook,* 45 Cal. 2d 228, 233 [288 P.2d 1].)

█ The same is true of the fact that the court did not instruct the jury on the effect of admissions made if defendant was not possessed of his faculties. Defendant did not request such an instruction. Assuming, but not deciding, that if such an instruction had been requested, it would have been the duty of the court to give it, there could be no error in not giving such an instruction when it was not requested. It should be pointed out that in addition to the statements made by defendant at the scene of the crime, later in the morning after he admits he recovered consciousness he made similar statements to the police at the Hall of Justice, and then in the afternoon to the district attorney (this statement was taken down by a secretary), all of which refuted his claim that he did not remember the events in the bar after Ward struck him.

See *People* v. *Clifton, supra,* 186 Cal. 143, 150, where the court held that where, as here, "Every witness who testified regarding the matter testified that although the defendant was somewhat under the influence of liquor, he apparently sufficiently understood and intelligently answered the questions" (p. 150) it was not error to refuse an instruction

*offered by the defendant* upon the same subject which defendant here contends the court should have given of its own motion.

### (c) *Refusal of instructions on first degree murder*

The only practical difference between the offered instruction on the difference between the degrees of murder and manslaughter and the one given by the court is that the court's instruction omitted reference to a killing perpetrated by means of poison, lying in wait, torture or in the perpetration of the crimes mentioned in the homicide statute. As none of these elements were involved in this case, we see no error in not mentioning them to the jury. We find nothing in *People* v. *Holt, supra*, 25 Cal.2d 59, 89-90, cited by defendant, or in any other case requiring the court to point out in a case where none of these situations are involved, the situations in the commission of which a killing would automatically become first degree murder.

### 3. ALLEGED MISCONDUCT.

We see no misconduct in the comment of the district attorney to the effect that defendant's statement was in evidence. He was referring to defendant's oral statement which the officer reduced to writing. The confusion between defense counsel's reference to the writing and the district attorney's reference to its contents could easily have been cleared up had defendant at any time called the matter to the attention of the court. This situation well illustrates the rule that to take advantage of alleged error on appeal defendant must object in the trial court. Had he done so the court would have informed the jury of the correct situation.

### 4. IMMATERIAL EVIDENCE.

Mrs. Ward, the victim's wife, was asked by plaintiff if she saw Ward on the night of the homicide. She stated she saw him at the hospital. She was asked whether she or he was the patient there. She stated that she was. She was then asked for what purpose she was a patient there. Defendant's objection was overruled and she replied "childbirth," and then testified that it was a girl and that she had no other children. (No objection was made to the question eliciting this information.) Obviously the matter was not relevant or material to the guilt or innocence of the defendant. The objection should have been sustained. However, the error could not possibly have been prejudicial.

Defendant contends that the admission of two photographs of the deceased taken after the killing should not have been admitted as their only purpose could have been to prejudice the jury. *People* v. *Burns,* 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9], and *People* v. *Cavanaugh,* 44 Cal.2d 252, 266-268 [282 P.2d 53], discuss at some length the matter of admitting photographs in homicide cases of the dead body of the victim. As there pointed out, if the photographs can be of some help to the jury they are admissible, and "there is a line between admitting a photograph which is of some help to the jury in solving the facts of the case and one which is of no value other than to inflame the minds of the jurors." (Burns case, p. 542.) We do not believe that that line was crossed in our case. The pictures were not gruesome. Defendant's attorney had shown one of the photographs to defendant asking him if he had ever known the person depicted. We agree with the statement of the trial judge, the Honorable Donald K. Quayle, concerning them: "I don't think it is inflammatory in the sense that it would upset the Jury or create any bias or prejudice in their minds, and I do think it has some evidentiary value in showing the exact point of the wounds here, whether or not intoxication enters into it; the degree of the crime enters into it and the ability to locate on an alleged first blow a vital spot, I think has some probative value."

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.