[Crim. No. 2460.   First Dist., Div. One.   Oct. 23, 1947.]

THE PEOPLE, Respondent, v. JOHN J. COSTON,
Appellant.

Alfred J. Hennessy for Appellant.

Fred N. Howser, Attorney General, Clarence A. Linn and Carl W. Wynkoop, Deputy Attorneys General, for Respondent.

BRAY, J.—Defendant was convicted by a jury of murder in the first degree with penalty of life imprisonment.

The facts in this case read like a story taken from the Arabian Nights. In May, 1943, defendant, who was then living in Norfolk, Virginia, with his wife, Goldie, to whom he had been married for about eight years, enlisted in the Navy. While he was away from home in the service, his wife became acquainted with the deceased, Lieutenant White, who was also in the Navy. Apparently, the gold braid of an officer was more appealing to Goldie than the blue jacket of an enlisted man, for in June, 1945, Goldie left defendant in Norfolk and went to Reno to get a divorce so that she could marry White. Defendant followed her to Reno, arriving there July 16th.

There he learned for the first time that she was getting a divorce. Defendant testified that Goldie told him that the divorce was sort of a joke on their friends so that they could get remarried again. At any rate, defendant signed the documents which her Reno attorney desired signed, so that the divorce could go through expeditiously. Defendant spent approximately 12 days in Reno, during the six weeks' period required for Goldie to get her divorce. Defendant contends that during his stay he and she lived together as husband and wife. Goldie denies this, but admits that the first night he was in Reno he stayed all night at her apartment, and that the next day "He checked in [at a hotel] as Mr. and Mrs. because they would not let him have a room by himself." On April 12, 1946, practically nine months later, a child was born to Mrs. White. This child defendant claims was conceived during his stay in Reno, and also claims that Goldie told him on several occasions that the child she was going to have was his. She denies this, but it is significant that in her letters to defendant she called the unborn child "Spike," a name given it by defendant. She received her divorce on August 27, 1945, and married White in San Francisco on August 31, which is the date upon which she claims the child was conceived. Less than two months after her marriage, Goldie went to Norfolk, because of the illness of her mother. She was in Norfolk approximately from October 12 until October 25. Defendant claims, and is supported in this behalf by witnesses, that Goldie lived with him during her stay there. This she denied. On her return to her husband in San Francisco and about the first of November, Goldie talked over the phone to defendant, who was in Norfolk. Up to this time, in spite of her admission that she saw defendant daily during the time she was in Norfolk, she had not told defendant of her marriage to White. She did so in this phone conversation. A day or so later she wrote him indicating that, as he claimed, they had discussed remarriage ("How about the marriage? Do I have to wait two and a half years before I get married?"). On November 3, defendant wrote her a long, rambling letter in which he stated, among other things, "Goldie, let's be friends. Now I don't want to cause you any trouble with him, but any time he objects to me tell him to be man enough to take it out on me, not you, I'm his size, I don't give a damn how big he is or how little—in other words if he treats you O. K. he is regarded by me as a friend, but on the other hand *if he steals you away from me then craps on you, sister, he will pay the*

*price,* 'so help me God I just want to remind you Goldie I'm sober' or I guess you say I'm crazy.'' (Emphasis added.) A couple of days later, November 5th or 6th, defendant arrived in San Francisco by plane, and went up to the Whites' apartment about 1:30 in the afternoon. He remained with Goldie all afternoon, even going with her to the grocery store while she did her shopping. White returned home about 5 o'clock and defendant, after congratulating him upon the marriage, stayed for dinner and spent the evening with the newly-married couple. Defendant then charged White with being the cause of some difficulty defendant had had in getting the Navy to transfer him from sea duty to shore duty at Norfolk, which White denied. Defendant returned to Norfolk and Goldie arrived there about a week later, on December 16th. The cause of her going to Norfolk is disputed. It seems that a few days before, defendant's stepfather was shot in his Norfolk home. Goldie claims that defendant called her on the phone, told her that his mother had shot her husband, and asked Goldie to come to Norfolk to help in the defense of the mother as Goldie could testify that on a number of occasions the husband ''had gotten fresh'' with her. (Incidentally, both the mother and the stepfather testified at defendant's trial, that the stepfather accidentally shot himself.) Defendant claims that Goldie, by telephone, made up this story about his mother doing the shooting and asked defendant to send her a telegram to come to Norfolk to testify, so that she would have an excuse to show to her husband. She went to Norfolk, defendant having wired her $150 for plane fare. Goldie remained in Norfolk for over a month, occupying, according to defendant and several witnesses, an apartment with him. This Goldie denies, although admitting she saw defendant every day and claiming that he was trying to get her to leave White and come back to him. During this time defendant took her to an attorney where the matter of getting a divorce from White was discussed. Goldie admits the discussion, but denies she ever intended to get such a divorce. She claims that defendant was threatening to have her husband kicked out of the Navy, and that she would have divorced White rather than have that happen. Defendant claims and she denies that she told the lawyer that her unborn child was defendant's. In response to an invitation to visit his sister in Oakland defendant flew to San Francisco arriving the morning of February 25th. He immediately went to the White apartment. Defendant claims that Goldie had asked

him to come there to see her before she went to the hospital as she felt that she was not going to survive childbirth. This she denies, but language in one of her letters corroborates defendant on her fear of childbirth. At this time defendant stated that he was going to Los Angeles to get a job. From February 25th to March 12th, defendant and Goldie saw each other practically every day. Three or four days before March 12th, defendant met White and Goldie coming from the store and went to the apartment with them. He told them he was leaving the next day and had come to say goodbye. He claims that White refused to drink with him and he threatened to turn White into the Navy if he did not get his baby when born. (He admits that he had consulted naval legal authorities as to his rights against White for taking his wife.) He did not leave the next day, but continued to call at the apartment in White's absence. On March 12th, the day of the shooting, according to Goldie, defendant for the first time in San Francisco asked her to leave her husband. Defendant brought with him from Norfolk his service revolver, .45 caliber, at the request, he contends, of his sister. A letter was received in evidence, which she testified she wrote to defendant on February 12, 1946. In it she requested defendant to bring his gun as someone had tried to break into her house. However, defendant did not give her the gun. On the morning of March 12th, he left the sister's home in Alameda, carrying the unloaded gun and eight cartridges in a sack. He claims he brought them to San Francisco to pawn to supplement his cash so that he could buy a plane ticket to Norfolk that night. About 10:30 that morning Goldie met him on Pine Street in front of a tavern, he claims by prearrangement, which she denies. They went into the tavern, remaining there about 45 minutes. According to defendant, and denied by Goldie, he told her that he was returning to Norfolk and showed her a letter from a girl there. He told Goldie that he planned to marry that girl. Goldie then asked him not to leave San Francisco as she did not think she would live through the childbirth and "what will become of Spike"; that she would leave White after the baby was born, if she survived. Defendant claims, again denied by Goldie, that he showed her the gun and cartridges and told her he was trying to get the money on the gun and asked her to let him have some money. She offered him $6.00, which he did not take. He claims that he reluctantly went to the apartment with her and while there she "pulled her dress up showing her body where, what she

termed 'Spike is kicking.' She said, 'You can't leave us.' ''
Goldie denies the entire incident. She claims she purchased
groceries and took them to the apartment. Defendant then
again met her in front of the tavern about 12:30 or 1 p. m.
He accompanied her to the 5 & 10 store and to the branch post
office, and then to a tavern. At this time, according to Goldie,
defendant asked her to leave White and go and live with de-
fendant's sister. She told him that she would not leave White
as she loved him very much. Defendant denies that any such
conversation took place. After a few minutes they left the
tavern. Defendant claims that the last time he saw Goldie
that day he was to call back to see if she had been able to
borrow money to give him to go to Norfolk. Goldie testified
that about 3:30 o'clock defendant came to her apartment and
asked her if she had changed her mind about not leaving White
and that he then said he would call her at 4:30 to find out
again if she had changed her mind. Around 5 o'clock defen-
dant phoned her. He asked her if she had changed her mind,
and when she said no, he angrily said, ''Well, I am taking
matters into my own hands.'' The bartender in a certain
tavern testified that about the same time defendant telephoned
to someone from his place, and spoke in a loud and angry
voice, and slammed the phone. About 8 o'clock Goldie and
White left the apartment and went about a block and a half
to get newspapers. They returned in about 20 minutes.
Goldie took her coat off and went to hang it in the closet and
White walked into the bedroom to hang up his coat. The door-
bell to the apartment then rang. White went to answer it.
At that time Goldie was either in the closet or sitting on the
chesterfield, in easy hearing distance of the apartment hall.
Goldie saw flashes through the frosted glass of the door and
heard shots. Rushing into the apartment hallway she found
defendant lying face down on the floor at the feet of White,
who was also stretched out on the floor. Defendant's arms
were extended. His revolver lay about 4 inches from one of
his hands, which was apparently attempting to grasp the gun
just out of reach. White had four bullet wounds in his body,
and one through his left arm. Defendant had one bullet
wound over his heart. White was dead, and defendant ap-
parently dying. Defendant was taken to the hospital and in
due time one of the miracles of modern surgery performed.
The bullet had gone completely through the heart and the
body. The heart was stitched and defendant later recovered.

Paraffine glove tests were made of the hands of both White and defendant, which showed powder marking on both hands of defendant and none on the hands of White. In the apartment hallway the broken glass on the floor and a mark on the door indicated that defendant had broken the door glass with his revolver butt from inside the door. The powder marks, the position of the men on the floor, the location of the gun, the nature and location and direction of the wounds on each man, the lack of powder burns on the clothes of White, and presence and location of powder burns on the clothes of defendant, the fact that defendant's coat and topcoat had no bullet hole to correspond to the hole in the front of defendant's vest, the fact that all the bullets were fired from defendant's gun, and the other circumstances of the case, force but one reasonable conclusion, that defendant shot White and then turned the gun on himself.

The contentions made by defendant on this appeal will be taken up in order.

### Alleged Insufficiency of the Evidence

Defendant contends that the evidence did not prove any homicide, and that there is no evidence that the homicide, if proved, was deliberate, wilful and premeditated. He contends that under the evidence it is equally probable that the killing could have been murder, manslaughter, lawful self-defense, or that a ''bandit who made good his escape may have shot both deceased and appellant.'' The chief premise upon which he bases the latter contention is that there is no evidence of what transpired between White and defendant in the very short interval between the time White answered the doorbell and the time the shots were fired. Goldie did not hear the conversation, if any, between these parties. To carry defendant's argument on this subject to a logical conclusion, no one ever could be convicted of homicide where the actual killing was not witnessed. To say that the shooting may have been by an outsider or in self-defense is to ignore completely the circumstances of the shooting and the evidence in the case. As to the outsider doing the shooting, such suggestion completely ignores, among other things, the fact that the shooting was done with defendant's gun. The self-defense theory will be discussed later.

While the rule is that the verdict of the jury, which has been approved by the trial court, cannot be set aside on appeal unless it clearly appears that upon no hypothesis whatever is

there sufficient, substantial evidence to support the jury's conclusion (*People* v. *Tom Woo,* 181 Cal. 315 [184 P. 389]; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]), in this case there is practically no evidence that would justify a conclusion that the killing was not deliberate, wilful and premeditated. On November 3, 1945, defendant wrote Goldie after he knew she had married White that if the latter "steals you away from me then craps on you, sister, he will pay the price, 'so help me God. . . .'" On November 5th, he arrived in San Francisco by plane, and without warning appeared at White's apartment and then flew back to Norfolk that evening. A few days later in Norfolk defendant told Goldie's sister that he was coming to San Francisco to kill Goldie, White and himself. "He was going for a one-way ride." And on other occasions about this time he told the sister that he was going to kill White if it was the last thing he did, and that he was going to make Goldie suffer. In one letter defendant wrote "He [White] should be happy knowing I'm not going to do anything to him until after the baby is born." In January, 1946, defendant in a long distance phone conversation with White showed ill feeling towards him. Defendant very definitely felt (and with good reason) that White had stolen Goldie from him, although the evidence shows that, unknown to White, Goldie was still interested in defendant. Defendant also felt that White was responsible for the Navy keeping him on sea duty so long and that White was trying to make trouble for him with the Navy over some allotment checks. Defendant admitted that in January he had threatened to turn White into the Navy for stealing his wife. Assuming defendant brought the gun to California at his sister's request, and that the sister changed her mind about wanting it after defendant arrived, even if one believes that the defendant brought the gun to San Francisco the morning of the shooting to pawn it, it is extremely significant that it was then unloaded. Sometime that day defendant decided to kill White and himself and then loaded the gun. There is no other inference possible under the evidence. While heretofore defendant had been content with sharing Goldie with White, on March 12th, he demanded that she leave White. He would not take no for an answer. He finally called her at 5 o'clock and when she still refused to change her mind he decided to take matters into his own hands, and so told her. He next appeared at the apartment door, rang the bell and almost immediately started shooting White and himself. Defendant told a medical stu-

dent at the San Francisco Hospital the second day after the shooting that when White came to the door defendant deliberately killed him and then turned the gun on himself. In defendant's pocket when he was taken to the hospital was an envelope on which defendant had written "To my mother, Mrs. T. R. Beck, 330 Duncan, Norfolk, Virginia, please notify." This was dated the day of the shooting. Defendant claims he wrote it that afternoon in the tavern. There was also another envelope with a similar endorsement on it which he claims he wrote while on the plane in November, 1945. There could hardly be a stronger case of deliberate premeditation and wilful murder.

Although defendant in his opening brief denied that there was evidence that he tried to commit suicide, in his closing brief he claims that the fact that he did attempt to commit suicide negatives premeditation and deliberation. It is a little difficult to follow that reasoning. The designing of a plan to kill both White and himself shows that he planned and premeditated. Defendant argues, further, that the attempt to commit suicide indicates great instability of mind or even insanity. This is the first time the question of insanity has appeared in the case (except, of course, a plea of not guilty by reason of insanity, which was withdrawn after verdict). Defendant says it is not legal insanity but medical insanity, and that defendant was in an insane frenzy and incapable of forming an intent to take life premeditatedly and clearly. However, there is no substantial evidence to justify this contention. It is true that defendant testified that in the apartment at 4 o'clock that afternoon he told Goldie "It is driving me insane," but there is nothing else upon which to base such a claim. It is negatived by the threats which preceded his preparation for the crime, his bringing the gun to San Francisco when he had all day to consider and deliberate his actions generally, and the entire circumstances of the case. As defendant told Goldie's sister about four months before, he intended to shoot both White and himself and make Goldie suffer. He did.

Defendant admits that the evidence showed motive. "The motive, it might be argued, arose from the chagrin over the loss of his wife, his enmity towards the deceased because of the breaking up of his home, and his despair over his failure to induce her to return to him. . . ." The threats, both express and implied, were proved by the testimony of Goldie, her sister, and defendant's letters. Defendant then contends

that the third element necessary to prove that he committed a homicide of any kind, the carrying out of the threats, was not proved, because no one actually witnessed the shooting. But the physical facts themselves are subject to only one interpretation, namely, that defendant did all the shooting that was done that evening. Cases like *People* v. *Lamson*, 1 Cal.2d 648 [36 P.2d 361], cited by defendant, are not in point, as their facts are so dissimilar from those here. *People* v. *Salaz*, 66 Cal.App. 173 [225 P. 777], *People* v. *Frank*, 2 Cal. App. 283 [83 P. 578], and *People* v. *Howard*, 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], were cases in which proof of the corpus delicti, or that defendant was the killer, depended practically entirely upon the admissions of the defendant. Here, it does not require the admissions of the defendant to prove either.

On reduction of degree defendant cites several cases. In *People* v. *Kelley*, 208 Cal. 387 [281 P. 609], the killing occurred during a drunken orgy. The homicide was reduced from first degree murder to manslaughter because there was no evidence of malice, deliberation or premeditation. In *People* v. *Howard, supra* (211 Cal. 322), the court reduced the homicide from first degree to second degree murder. There the defendant killed his roommate. There was no evidence of the circumstances of, nor the reason for, the killing, except the defendant's confession. This confession established only second degree murder. In *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8], the conviction of first degree murder without recommendation was reduced to murder in the second degree. There the killing was accomplished in a drunken orgy and there was no proof of malice or premeditation or deliberation. In *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21], the conviction of first degree murder without recommendation was reduced to second degree murder. There the decedent kept advancing towards the defendant, after a warning shot by the defendant and a warning not to come closer. In *People* v. *Heslen*, 27 Cal.2d 520 [165 P.2d 250], on a rehearing of its first decision, and upon motion of the attorney general, not resisted by defendant, the court reduced a conviction of murder in the first degree with death penalty, to second degree murder. In none of these cases were the facts similar to those in the case at bar. In the Holt case, Schauer, J., discussed at great length the difference between first and second

degree murder and between murder and manslaughter. He adopts the language used in *People* v. *Howard, supra*: " 'To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, *the unlawful killing must be accompanied with a deliberate and clear intent to take life.*' " (Italics added.) Applying that test here, there can be no doubt that at the time of the shooting defendant had a deliberate and clear intent to take White's life, and his own, as well.

In his brief defendant cursorily states that the shooting was not proved to have been done by defendant's gun. He does not point out in what respects such proof falls short. The defendant admitted the gun was his, and the circumstances of the shooting and the tests made by the expert are so conclusive on this subject that there can be no reasonable question about it.

*No Error in Instruction Concerning Degrees of Murder*

■ Defendant complains particularly of an instruction which used this language in defining murder in the first degree: "There need be, however, no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind." Defendant relies principally on the cases of *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7], and *People* v. *Bender, supra* (27 Cal.2d 164), for his contention that the giving of this instruction was error. Considerable confusion has arisen on the question of what instructions on first degree murder a trial court can safely give since the decision of these two cases. While the Bender case indirectly criticizes this language, it states that it is "abstractly a correct statement of the law." (P. 182.) It then goes on to say in effect that the objection to the use to jurors of that language is that unless it is fully explained the jurors may be misled by it; they may get the idea that where the act is executed in the very moment it is conceived, the matter of premeditation and deliberation may be entirely eliminated, and hence there would be no field for the classification of second degree murder. The important thing, according to the Bender case, is that to make the crime first degree murder there must be deliberation and premeditation in forming the intent. We are here, of course, not considering murder committed in the spec-

ified situations such as in perpetration or attempt to perpetrate arson and the other crimes enumerated in section 189, Penal Code, but are considering the part of that section which includes in murder of the first degree "any other kind of wilful, deliberate, and premeditated killing." As pointed out in the Thomas case, the section requires "as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill." (P. 900.) The Thomas case then goes on to show that it is the intention to kill, which must be deliberate and premeditated and that when that test has been met the act may follow instantaneously. "Since the decision in *People* v. *Sanchez* (1864), 24 Cal. 17, 30, it has been repeatedly declared that 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind,' but this is not the equivalent of saying that the *intention to kill* can be formed without being preceded by deliberation and premeditation. It is only a declaration that the act of killing may instantaneously follow the intention once the latter is finally formulated. It does not imply that mature reflection (deliberation and premeditation) need not precede the ultimate formation of the evil intention. By its very language it has reference only to the 'space of time between the intention to kill and the act of killing.' In other words, a murder is of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. This view of the law is manifest in the Sanchez case by the statement (at p. 30 of 24 Cal.) that 'The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.' "

That this is the underlying basic fact of the Bender case is shown by the following (p. 184 of 27 Cal.2d) : "The words 'deliberate' and 'premeditate,' as above shown, have clearly defined and commonly understood meanings. In view of such commonly understood meanings it might not be necessary, at least in the absence of a request therefor, for the trial court to instruct the jury at all on the significations of those words, but when it does undertake to define or describe their significativeness any definition or description given should be fair and

complete. For example, the jury may be told that 'Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed.' (*People* v. *Thomas* (1945) *supra*, p. 900 of 25 Cal.2d.) But if they are instructed in that vein, which emphasizes the rapidity with which thoughts may follow each other, fairness requires a further instruction placing at least equal emphasis on the true (see definitions above) meaning of the terms. In other words, while the jury may be told that the brain can function rapidly they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate, or impulsive, unstudied, and premeditated. The extent of the reflection in every case, if it is to pass the test, must fairly and reasonably meet the ordinary and unquestioned significations of the test words.''

A reading of the instructions on first degree murder in our case shows that they were framed from the opinion of Mr. Justice Schauer in the Bender case. After qualifying the previously quoted portion by saying that ''In other words, a murder if [is] of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention, *if that intention has been reached with deliberation and premeditation*'' the instruction uses verbatim the above-quoted language from the Bender case which was taken from the Thomas case. (Emphasis added.) (See *People* v. *Thomas,* p. 900 of 25 Cal.2d.) The instruction then goes on to use the very definitions of ''deliberate,'' ''premeditated,'' ''malicious intent,'' and ''malice aforethought'' given in the Bender case. This instruction is a proper one. Apparently it was thoughtfully and painstakingly drawn to meet the suggestion in the Bender case that language which is abstractly a correct statement of the law might be misunderstood unless properly explained. The very explanation of it given in the Bender and Thomas cases was given here.

In order to constitute first degree murder, as pointed out by defendant, based upon the Howard and Bender and other cases, there must be both deliberation and premeditation. However, to carry the theory of those cases to the conclusion defendant reaches, or to find that under the circumstances of this case evidence did not fully justify the finding that there was both such deliberation and premeditation, would mean that no longer in California would a first degree murder conviction stand unless there were eyewitnesses at the exact moment of killing, and unless the defendant himself at the moment of killing stated something to the effect that he had fully deliberated and premeditated and knew what he was doing. To hold that the logical and reasonable inferences from the circumstances which preceded the killing cannot be used by the jury in determining whether there was such deliberation and premeditation on the part of the killer, is to make a travesty of justice, because there always will be, as here, killings in which the movements of the killer immediately before and at the time of the killing cannot be shown. Moreover, it is impossible to show the workings of a defendant's mind other than by his acts. Yet this is the result the defendant is contending for here, that because no eyewitness saw the killing or heard the defendant say what was in his mind (except, of course, his statement to Goldie that he was going to take matters into his own hands, which the defendant passes off as of no importance) the jury may not consider the facts in this case which would cause any reasonable person to conclude that there had been the deliberation and premeditation required by the law. Life is being too lightly regarded as it is, but to stretch the rule in the Bender and Thomas cases to the extent asked for here, would mean that the taking of life never could constitute first degree murder except where taken in connection with the commission of crimes mentioned in section 189 of the Penal Code. To reduce the degree here to second degree or manslaughter would be to ignore completely the evidence and the fact that a jury, which is the exclusive judge of the credibility of witnesses (*People* v. *Robinson,* 49 Cal.App.2d 576 [122 P.2d 77]), saw the witnesses, and decided on very substantial evidence that defendant was guilty of first degree murder. In doing so, they resisted the sympathy they must necessarily have had for a man whose wife had been taken from him by a superior officer, who had knocked at death's door and been saved therefrom by a miracle, who

fainted on the stand, and because of his condition required many recesses of court.

The rule on appeal in this respect is well stated in *People* v. *Thomas, supra* (25 Cal.2d 880, 904): "Defendant urges that the rule is 'that the judgment must be reduced *when there is a doubt* as to the sufficiency of the evidence to support the higher crime' and that 'the doubt which justifies the reduction is the court's doubt and furthermore it is the doubt of *the particular court passing upon the question.'* (Italics added.) This view of the law would require courts of appellate jurisdiction in all cases involving crimes divided into degrees or including lower offenses, where the defendant was convicted of any other than the lowest possible class or degree, to examine and pass upon the *weight* of all the evidence in the record. We are satisfied that the trial court (with or without a jury), as the original trier of facts, having the witnesses before it and possessing facilities peculiarly appropriate and convenient to the ascertainment of facts, is in a better position than are we to pass upon the weight of evidence, and that the Legislature in amending subdivision 6 of section 1181 of the Penal Code to provide that 'When the verdict is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed,' did not intend to effect a general alteration of the rule as to the respective functions of trial and appellate courts. While the *power* granted to the appellate court is equal to that given the trial court the circumstances which will justify its exercise in a particular court are those which are appropriate to typical functioning of that court. In other words, upon an application to reduce the degree or class of an offense, a trial judge may review the *weight* of the evidence but an appellate court should consider only its *sufficiency as a matter of law.* This is in accord with the general rule stated in *People* v. *Holt* (1944) *supra, ante,* pp. 59, 70: 'The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy' and (p. 90) 'While the jury is given the function of determining the facts upon the evidence it does not have the power of changing the standard [as to what constitutes murder of the first degree as distinguished from murder of the second

degree].' Implications to the contrary in *People* v. *Howard* (1930) *supra*, 211 Cal. 322, 330, are disapproved. Having examined the record in this case we do not feel constrained to hold that the evidence is legally inadequate to support a verdict of murder of the first degree. Hence, we are not authorized to reduce the judgment under our view of section 1181 (6) of the Penal Code.''

■ If there were error in giving this instruction, and there was not, such error would not be prejudicial under section 4½ of article VI of the Constitution. There was no evidence in the case upon which a jury could reasonably believe that the intention to kill was formed the very instant of the act. Among many other factors his appearance at the door of the apartment with a loaded gun which most of the day had been unloaded, after he claims that he did not want to see White again, his act earlier that day in endorsing on an envelope the direction to notify his mother when he already was carrying an envelope with a similar direction on it, and his suicide attempt, would completely negative any possible inference that the killing was the result of a spur-of-the-moment thought.

Although not necessary to a finding of first degree murder, in view of all the other testimony in the case, it is a very reasonable inference from the evidence that just before the shooting defendant was waiting in or around the apartment building for the Whites to return, and hence, actually was ''lying in wait,'' which under section 189 of the Penal Code is conclusively presumed to show wilful, deliberate and premeditated killing.

### The Instructions on Unconsciousness

■ The court after instructing the jury that if a person commits an act while unconscious he does not thereby commit a crime, that unconsciousness is classified separately from insanity, and defining what is the state of unconsciousness, giving somnambulism an an example, then gave the following instruction : ''You are instructed that the inability to remember. is not evidence of unconsciousness. The inability of a defendant or a witness to remember is of such common occurrence and so naturally accountable for upon the normal defects of memory, or, what is more likely, the intentional denial of recollection, as to raise in and of itself not even a suspicion of unconsciousness.''

Defendant contends that this instruction is untrue as a matter of fact and improper as a matter of law. It was taken

practically verbatim from the opinion in *People* v. *Sameniego,*
118 Cal.App. 165 [4 P.2d 809, 5 P.2d 653], where it was used
in considering defendants' claims that because of the use of
a certain drug they were unconscious at the time they made
confessions of guilt. The court held that statements of inabil-
ity to remember are not evidence of unconsciousness at the
time of the confessions, because such alleged forgetfulness is
a matter ''of such common occurrence and so naturally ac-
countable for upon the normal defects of memory, or, what is
more likely, the intentional denial of recollection, as to raise
not even a suspicion of the declarations having been made
while in an unconscious condition.'' (P. 173.) This instruc-
tion is incorrect in that evidence of forgetfulness may be an
element in the proof of unconsciousness. ■ However, it
is certain that a defendant's mere statement of forgetfulness,
unsupported by any other evidence, is at most very little
evidence of unconsciousness at the time of performing a par-
ticular act. There must be something more than his mere
statement that he does not remember what happened to justify
a finding that he was unconscious at the time of that act.
Here the only purported evidence of unconsciousness was the
defendant's own statement of lack of memory. No explana-
tion was offered, by medical testimony or otherwise, as to
why he did not remember, nor as to why he was unconscious, if
he ever was, except, of course, some intimation that Goldie's
talk with him about the coming birth of the child, and her
request for him to stay when he told her he was going to
Norfolk to get married, might have caused it. The error in
this instruction was error without prejudice. The defendant
offered no instruction on the defense of unconsciousness. The
court fully and fairly (with the exception of the above-quoted
portion) instructed on the subject of unconsciousness. There
was no evidence upon which the jury would have been justified
in finding that defendant did not know what he was doing at
the time of the shooting. Defendant claims that the last clear
thing he remembered until about the time of the preliminary
examination, on March 26th, was leaving Goldie's apartment
between 3 and 4 p. m. on the day of the shooting. That too
much reliance cannot be placed on his claim of lack of memory
is shown among other things by the following incident: When
asked if he had not called her to find out if she had changed
her mind about not leaving White, he definitely said (rep. tr.
p. 280): ''That call was for money. *I called her.''* (Emphasis
added.) Later when asked by his counsel if he made the

call, he said he could not say, he might have. While he claims his memory is a bit hazy about what happened in the apartment, he clearly remembers that he had told her he would call her about the money. He told his sister a couple of hours after the shooting, ''Get Goldie here, she can tell you everything''; and the medical student the day after the shooting that he had shot both White and himself. On March 15, he told a police inspector that he would rather wait a couple of days before telling what happened and made no claim that he did not remember. On March 18, he remembered that he had told the inspector ''the other day'' what had happened and that he had told the inspector that he drank some beer on the day of the shooting. He then stated, ''I remember everything that happened.''

Defendant at no time has stated that he was unconscious at the time of the shooting. His only claim is that he does not remember what happened. No reasonable explanation at the trial was attempted of why he should have become unconscious. Admittedly he used no drugs. True, at the trial he said he had some beer that day; at the hospital he apparently told the inspector he had had ten or eleven beers. The barkeeper who saw defendant angrily talking on the phone at 4 o'clock said he was not intoxicated, and of course unconsciousness brought about by voluntary intoxication would not be a defense. It could only be used on the question of intent in determining degree. (Pen. Code, § 22; *People* v. *Sameniego, supra* [118 Cal.App. 165].) Defendant at no time has claimed he was intoxicated, nor did he offer any instructions on the effect of intoxication.

Defendant's brief nowhere points out any facts which could have been a basis for a claim of unconsciousness, and any claim that Goldie's action towards defendant may have upset him so that he did not know what he was doing is inconsistent with his testimony. He testified that before leaving Goldie's apartment that day, she had exhorted him not to go away but to see her through the birth of his child, and had told him that she was going to leave White for him, although he had not asked her to do so, and she had promised to try to get for him the money he needed, and that he then told her he was going to Norfolk to marry another girl and that he did not want to meet White again. According to his story, what was there to upset him? He did not get particularly upset the year before when he found out that Goldie had divorced him so that she

could immediately marry White, nor when he learned that she had married; she was still living with him on occasions; she was going to bear his child, then leave White; she was even going to raise money for him. Moreover, defendant had had about eight months to become reconciled to Goldie's marriage to White. In the preceding November defendant had written, "Goldie, I sure feel relieved, to a certain extent, knowing that we are completely through, before I had hopes, but when you stop and consider everything I don't see how we could make a go of it, as you know too much has happened. Guess it is just as well this way." On the other hand, taking her story that she refused to leave White for him, she had done that before. There was no circumstance this time that would have caused such an upset as to cause his mind to go blank, and there is no testimony that any or all of these things would cause unconsciousness. An examination of the record shows that defendant changed his mind about what he was going to say about the circumstances of the crime. He first decided to tell the truth that he shot both White and himself, then he decided to claim that White shot him, and then he changed his mind and decided his best out was to claim he did not remember what went on. It is not reasonable to assume under the circumstances of the case that the verdict would have been any different had the court not given the complained-of instruction.

## Manslaughter Instruction

In instructing on manslaughter the court stated in effect that in determining the type of passion which would reduce the crime to manslaughter it must be based upon such facts and circumstances as were sufficient to arouse the passions of an ordinary and reasonable person. Defendant objects to this test. However, he offers no authority in support of his position except an abstract statement by the late Mr. Justice Holmes. The instruction in question is the identical language in which the opinion in *People* v. *Logan,* 175 Cal. 45, 49 [164 P. 1121], says the court should advise the jury; hence there can be no error in giving the instruction.

## Instruction on Self-defense

Defendant offered several instructions correctly stating the law as to self-defense. The court refused to give any, apparently on the theory that there was no evidence on which to base a claim of self-defense. The court did not err. There is not one iota of evidence of self-defense in the case. Defen-

dant's whole contention in this behalf is based upon the testimony of defendant's mother, stepfather, sister and brother-in-law that on March 19 (seven days after the shooting) they saw some blue and greenish-yellow bruises on defendant's legs and arms. There was no testimony that they were there prior to the 19th. The medical student, who testified it was his duty to look for presence or nonpresence of abrasions or lacerations, saw none on the night of the shooting nor at any time thereafter, except that defendant had a sore left leg due to blood transfusions given him. In addition, the police inspector and the criminologist who saw the defendant naked, saw no such markings. Any claim of self-defense in this case is completely fanciful in view of what took place at the Whites' door. The defendant does not claim that he was acting in self-defense, nor that any occasion arose justifying the shooting. He just says he does not remember. To expect serious consideration of such a claim there must be something more than bruises discovered a week later by the family of a man who appears at the victim's door with a loaded revolver. Where there is no evidence tending to show that the homicide was committed in self-defense, instructions on self-defense should not be given. (*People* v. *Manoogian*, 141 Cal. 592 [75 P. 177]; *People* v. *Stephens*, 5 Cal.App.2d 33 [42 P.2d 86].)

### Exclusion of Evidence

On cross-examination Goldie was asked, "Isn't it a fact that on the next day [after his arrival when she was getting her divorce] you and he registered at the Travelers Hotel in Reno as Mr. and Mrs. John Coston?" The court sustained an objection to this question. If this was error, it was cured later on in the trial when Goldie was asked, referring to the same time: "Q. Did you check in at the Travelers with him? A. No, I did not. He checked in as Mr. and Mrs. because they would not let him have a room by himself. Q. Were you there when he checked in? A. No, I wasn't."

Goldie wrote defendant at Norfolk eleven letters while she was in San Francisco living with her husband White. These letters were offered in evidence. At first the court sustained objections to their introduction. Later the following occurred: They were again offered in evidence. The court stated that there might be some portions of the letters which would be contradictory of testimony given by Goldie, and that such matters would be admissible. He then suggested that counsel look the letters over and call the attention of the

court to the portions of the letters which came within that category. Later defendant read into evidence portions of the letters which had apparently been agreed upon in conference, but expressly not waiving his offer of all portions of the letters. Defendant then asked for a recess to have an opportunity to go through all the letters "because there are other parts that may be germane to the issue and admissible." Upon returning from the recess this occurred: MR. PEERY [for the prosecution] : . . . If your Honor please, in the interest of time, if counsel wishes to read all the letters, I withdraw my objection. I feel certain portions of them are not material, and under your Honor's ruling I think you feel the same way, but in the event they want to read them all, go ahead. THE COURT: Or read them in argument? MR. PEERY: We can stipulate we can refer to them in argument. MR. KLEIN [for the defense] : Yes." Still later, the subject of the letters was again brought up. "THE COURT: Is that all this afternoon, gentlemen, or are you going to read those letters, whatever you desire? MR. TONER [for the defense] : I think we have stipulated if we desire to read the letters in argument we may use any portion of them. MR. PEERY: How about the other one? Shall I put that in and refer to that in argument? MR. KLEIN: Yes. It is a letter from his sister to Johnny. It is certainly agreeable to be put in. If you have any letters other than these, Mr. Peery, —the police got all the letters in Johnny's possession, produce them and we will be glad to take them in. They may be offered as the prosecution's. MR. PEERY: Next in order. MR. KLEIN: Yes."

It is clear that any error the court might have committed in at first denying admission to the letters was later cured. To all intents and purposes, all the letters were in evidence and so considered by the parties. Moreover, we have read the letters and the omitted portions are merely cumulative of the relationship between defendant and Goldie, which was already well shown in the portions read to the jury.

The judgment is affirmed.

Peters, P. J., and Finley, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 20, 1947.