[Crim. No. 845. Fourth Dist. May 22, 1952.]

THE PEOPLE, Respondent, v. EDGAR ALVIN WERNER, Appellant.

Robert E. Sears for Appellant.

Edmund G. Brown, Attorney General, Dan Kaufmann, Deputy Attorney General, C. M. Ozias, City Attorney (Fresno), and Richard L. Shepard, Assistant District Attorney, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of his wife on or about April 2, 1951. A jury found him guilty of murder in the first degree, fixing the punishment as life imprisonment, and he has appealed from the judgment.

The appellant and the deceased had been married for six years, but separated on February 8, 1951. He remained in their old apartment on College Street and she moved into a one-room apartment on Nevada Street, both in Fresno. During the separation period the appellant had been attempting to effect a reconciliation with his wife who worked

at the office of the Housing Administration in Fresno. When she left work on the evening of Friday, March 30, her superior gave her keys to the office so she could finish some work for him during the weekend.

A nephew of the deceased, who was in the Navy, came to visit her on this weekend. He arrived at 3 a. m. on Saturday, March 31, going to the apartment on College, and the appellant took him to the deceased's apartment. She was not there when they arrived, but the appellant got the key from a crevice where it was kept and they went in. The deceased arrived a few minutes later and they talked for half an hour. Since the deceased had no place for the nephew to sleep, they decided they would all go to the appellant's apartment and sleep there for the weekend. They talked about the nephew's returning on the following weekend, and the deceased stated she would then sleep at a friend's house and the nephew could use her apartment. They then went to the appellant's apartment, taking some blankets and a radio phonograph with them. The nephew slept with the appellant, and the deceased on a couch in the living room. Later that day they visited Yosemite Park and went to a night club in the evening. On Sunday, April 1, they visited friends and entertained the nephew in various ways. During the two days the nephew heard the appellant repeatedly ask the deceased to come back to him, pleading with her to do so, and she kept refusing. On Sunday a mutual friend called at the apartment and when he left the appellant followed him to his car and asked him to try to talk the deceased into coming back to him. There was evidence that he had made attempts to have other mutual friends intercede to this end.

The three had dinner at appellant's apartment on Sunday, April 1, between 5 and 6 p. m. The appellant and the deceased took the nephew to the airport and he left for San Diego at 8:40 p. m. En route to the airport they stopped at the deceased's apartment, dropping off her radio phonograph and the blankets. On the way to the airport the appellant told the deceased he would take her back to her office, where she had some work to do. At the airport they talked about the nephew's returning the following weekend. When he and the nephew were alone, the appellant told the nephew that if anything should happen to him or to the deceased the nephew should write to the deceased's parents in Pennsylvania "and tell them how they were living." A neighbor

in an adjoining apartment testified that she thought she heard the appellant and the deceased return to his apartment that evening, stay for a few minutes, and leave about 9:15 p. m. At about 9:30 that evening the deceased called one of her coworkers from the Housing Administration office. Apparently she was there to do the work which she was to do over the weekend, which would take her from an hour to two hours, and the work was found on the desk of her superior when he came to work the next morning. Adjoining neighbors heard someone moving in the appellant's apartment shortly after 1 a. m. on April 2d, and this continued until about 2:30 a. m.

Between 9 and 10 a. m. on Monday, April 2, the appellant appeared at the office of the dean of an Episcopal Church in Fresno. He appeared agitated and left shortly when he found the dean was not there. Later that morning, he withdrew $115 from his account in a bank in Fresno. On the morning of April 3, the appellant sent a telegram from Hollywood to the deceased's employer, purportedly signed by her which read: "Feel very bad to let you down on job. Must settle problem concerning Ted. Have left town to be alone and think. Plan to return Monday."

When the deceased failed to show up on Monday, April 2, her associates became quite concerned since she was a very punctual person, and she was to receive a promotion on that day. Her immediate superior and another employee went to her apartment at 3 o'clock that afternoon. They found the door locked with a typewritten note tacked to the door, reading: "Ted. Have gone to visit Lee and Lorna. Will notify office so don't bother them by calling. Be back next week. Bennie." Two coworkers returned at 5 o'clock and saw the note on the door. They looked in the window and seeing no activity, left. At 7 o'clock that night another coworker, with some other people, obtained a key from the landlady and went in. They saw a bunch of quilts piled on the divan, which the appellant used as a bed, and observed the bottom of a foot sticking out from under the covers. Without touching anything they walked out and the police were called. The police arrived at 7:13 p. m. and an officer raised the quilts revealing the body which was immediately identified. The deceased appeared to have been prepared for bed, having on pajamas and a bathrobe and with her hair in bobby pins. There was blood on her hair, on the pillow and coverings, on the pajamas, on the back of the

divan, and on the wall. About 8 inches above the divan there was a hole through the plasterboard about the size of an egg. A hammer head was found partly underneath the body of the deceased which appeared to have been freshly broken from the handle. The rest of the hammer handle was found on the opposite side of the apartment between a portable closet and the wall. There was blood on the handle of the hammer and also on the hammer head. A washrag and a bandana were found on the floor. There was blood on both and the washrag was damp.

The officers searched the appellant's apartment on College and found in a clothes hamper a sweater, a T shirt, and a pair of shorts, all of which had blood on them. Analysis showed that this was human blood which corresponded to the blood type of the deceased. A typewriter was also found there, on which the note pinned to the door of the deceased's apartment had been typed. The torn pieces of a similar note were found in a wastebasket, and the officers also found the keys to the office which had been given to the deceased.

An autopsy was conducted that night revealing that the deceased was about 30 years old, 5 feet 3 inches in height, and weighed about 120 pounds. From the testimony of the autopsy surgeon it appears that the deceased had been hit on the head with a blunt instrument in seven places. Two of these showed lacerations and one had cracked the outer layer of the skull but not enough to injure the brain. These injuries were not sufficient to cause death although they might have been a contributory cause. There was a narrow line of excoriation extending around the entire neck except for an inch and a half at the back of the neck. The front part of the neck showed linear abrasions as though something had been held tightly and moved back and forth, causing a scraping of the skin at the Adam's apple. There were also bruises below the elbow on the left arm. The autopsy surgeon expressed the opinion that the primary cause of death was strangulation by some sort of cord-like thing around the neck. He gave ample reasons for this opinion, which are confirmed by the pictures of the body which are in evidence. He estimated the time of death as two to seven hours after the last meal was eaten by the victim. He testified that the blows on the head would probably have had the effect of rendering the victim unconscious; that it would take longer than 30 seconds for strangulation to have occurred, as otherwise the hemorrhages in the lungs would not have

been present; that if a person had died in a shorter period than that in which one can hold his breath he would not be dying from strangulation; that it would take five minutes after shutting off the blood to cause death if there were no other condition, like a heart condition, to hasten it; and that in this case the hemorrhages show that the heart had continued to beat after oxygen was excluded from the lungs.

On June 7, 1951, the appellant was arrested by two special agents of the FBI at a monastery in New York State, about 60 miles from New York City. When they asked him his name he became excited and said: "I am the man. I am the fellow you are after. I did it. It was a horrible mess." They searched him and found in his pockets a small vial and another package of potassium cyanide. They told him they were going to take him to New York, that he did not have to say anything if he did not want to, and that he could procure counsel. When they got in the car the appellant said: "Thank God it is over. It was horrible. I am at the end of my rope." On the way to New York the appellant kept saying how much he loved his wife and that he could not understand how he had done this horrible thing. He also said "I am sure that I did it. Everything points to me." Also, "When I get to California I will get what I—— what you found in my pocket." He further stated that he had studied criminology, had been quite interested in it, had read a number of books, and that he had written some manuscripts in that connection. He also said "that he sure made a blunder of this matter, that he had been swimming with his wife and that he could have held her under the water." They stopped on the way to New York to feed appellant at a jail. After he had eaten, the agents asked him to sign a statement, which one of them had written, of the things he had told them. He refused to sign the statement although he admitted that it was correct. According to this statement, admitted but not signed by the appellant, he had told the officers that on the Saturday night of this weekend he and his wife and a relative had stayed in his apartment and the following day had gone to some park. They later drove the nephew to the airport, from which he was returning to San Diego. Later on, at 9 p. m., they went to the deceased's apartment where the appellant said he reviewed with her a radio script which he had prepared. He said he did not remember anything after that but the next morning he woke up and there was blood all over his clothes; that

he changed his clothes and went to his wife's apartment and saw her on the floor; that there was blood all over her face and her body; that he lifted the body and put it on the couch and covered it with a blanket; that he then returned to his apartment and typed the note which he tacked on the door of her apartment; that he went into the deceased's apartment and took $10 from her pocketbook and left; that he tried to talk to the dean at the church but could not see him; that later he went to the bank and withdrew $115; that he drove his car to Los Angeles and stayed at a motel; that he sent a telegram to his wife's employer saying that she was going to stay there; that later he went to the Lockheed airport, left his car there and went to New York, traveling under the name of Hart; that he stayed at various places in New York City and worked for a while in one place under the name of Hill; that he returned to New York City and just prior to his arrest proceeded to the monastery; and that he had attempted to commit suicide by running his car in a garage. He also told the agents that he and his wife owned two hammers, that either might have been at either home, and that he had been fixing some screens at his wife's house and he might have had the hammer at her home in that connection.

The pictures in evidence, taken after death, show a very pronounced line around the neck, apparently made by a rather narrow cord or something of that nature. No such cord or article of that nature was found. At the trial the appellant did not take the stand.

The sole question raised on this appeal is whether the evidence is sufficient to sustain a finding of premeditation and deliberation necessarily implied in a conviction of murder in the first degree. Conceding that the evidence is otherwise sufficient, the appellant contends that there is no evidence of the circumstances surrounding the death of his wife; that the gruesomeness of the attack and the manner in which she met her death would tend to indicate a violent act, committed in a wild fit of rage; that there is no evidence which would indicate that the intent to kill was arrived at after the deliberation and premeditation which is required; and that the judgment should be modified and reduced to murder of the second degree.

Beyond question, it is necessary that the evidence be sufficient to show deliberation and premeditation in order that a conviction of first degree murder may be sustained. (*People*

v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8].) In most of the cases in this state, in which the crime has been reduced to second degree murder, there was evidence of some situation, arising from excessive drinking or a violent quarrel, indicating that the crime was committed in a sudden fit of rage. ■ The weight of the evidence is for the trial court, and in order to upset such a verdict it must clearly appear that upon no hypothesis is there sufficient evidence to support the conclusion reached by the trier of fact. (*People* v. *Odle,* 37 Cal.2d 52 [230 P.2d 345]; *People* v. *Coston,* 82 Cal.App.2d 23 [185 P.2d 632].) ■ It is not within the province of an appellate court to determine conflicts in the evidence or to choose between different inferences which may reasonably be drawn therefrom. (*People* v. *Hills,* 30 Cal.2d 694 [185 P.2d 11].) ■ No rule can be laid down as to the character or amount of proof necessary to show deliberation and premeditation, and each case must depend upon its own facts. (*People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1].) ■ The required deliberation and premeditation need not be directly shown by the evidence but may be inferred from facts and circumstances which furnish a reasonable foundation for such a conclusion. (*People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1]; *People* v. *Hills,* 30 Cal.2d 694 [185 P.2d 11]; *People* v. *Guldbrandsen,* 35 Cal.2d 514 [218 P.2d 977].) ■ The mere fact that no eyewitness saw the killing or heard the defendant say what was in his mind at the time in question does not necessarily preclude a finding of deliberation and premeditation. (*People* v. *Coston,* 82 Cal. App.2d 23 [185 P.2d 632].) "In arriving at the intention of the defendant, regard should be given to what occurred at the time of the killing, if indicated by the evidence, as well as to what was done before and after that time." (*People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1].)

■ Although the appellant later said he could not understand how he had done such a thing, he at no time claimed that he had not intended to kill his wife. His only claim was that he did not remember what happened at the time in question and no explanation, reasonable or otherwise, was offered or appears for his lack of memory covering only that period. He made no claim that there was any provocation for the attack, and there was no evidence of any drinking or carousal or of any quarrel. There was no evidence indicating that there had been any struggle. It rather clearly

appears that the deceased must have been sitting on the divan when the blows with the hammer were struck. She was hit repeatedly, and apparently the final blow must have hit the wall with such force as to break the hammer handle. The blows she received would have rendered her unconscious but would not have killed her. The evidence amply justifies the inference that she was strangled after the blows were struck and while she was unconscious. She was not strangled by the use of the hands pressed on vulnerable spots, but by some narrow cord-like article. It clearly appears that this was done from the rear, with the article completely around her neck except where its two ends were held. It also appears that this article had been moved back and forth and held so tight around the neck as to leave a very unusual mark, showing rather clearly what had occurred. The appellant must have taken sufficient time to get the hammer, whether' or not it was in the room, and later taken time to get and use whatever was used to strangle her, which was then disposed of where it was never found. These facts tend to indicate sufficient premeditation. (*People* v. *Peete*, 54 Cal. App. 333 [202 P. 51].)

A motive appears in the appellant's failure to effect a reconciliation. The nature of the attack, as shown by the physical evidence, is even more suggestive in view of the appellant's actions shortly thereafter, including his long continued movements in his room and the note pinned on the door and the telegram sent to the office where the deceased worked, both purporting to be signed by her. There is also his statement to the nephew a short time before the crime was committed. Although the nephew was expected to return in a few days, the appellant asked him to make some explanation to the deceased's parents if anything should happen to her. It may fairly be inferred that he had something rather definite in mind. His later statement to the officers that he expected to get cyanide when he returned to California is also suggestive, in view of his admitted interest in and knowledge of criminology.

The fact that the appellant was apparently back in his apartment about 1 a. m. indicates that the killing had then been accomplished, and this is supported by the autopsy findings. He covered the body in such a way that things would look natural to anyone looking in at the window, and went to unusual lengths in trying to make it appear that his wife was still alive. There is no evidence of excessive

drinking or of any fact which would indicate anything that might naturally lead to a sudden rage; he made no claim of that nature when he told his story to the officers; and he did not take the stand to explain or deny any of the incriminating facts which were brought out against him.

Applying the established rules to the facts of this case it must be held that the evidence, with the inferences which can reasonably be drawn therefrom, is sufficient to support the implied findings of deliberation and premeditation and to support the verdict as rendered by the jury.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.